[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-14435

_____

D.C. Docket No. 3:11-cr-00058-CAR-CHW-2

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ANDREW WINGO,
a.k.a. Andy Wingo,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(June 16, 2015)

Before MARCUS and ROSENBAUM, Circuit Judges, and FRIEDMAN,[*] District
Judge.

ROSENBAUM, Circuit Judge:

_____

[*] Honorable Paul L. Friedman, United States District Judge for the District of Columbia, sitting by designation.

Sometimes running a district court can be like a high-wire balancing act. But when it comes to ensuring the competence of defendants when they go to trial or plead guilty, the court takes on the role of a safety net.

Our criminal-justice system depends on the exercise of, or knowing and intelligent waivers of, constitutional rights. But to engage in these activities, a defendant must first and necessarily have the abilities to understand the proceedings and to assist counsel. Because competence is the base upon which other constitutional rights balance, due process and Section 4241(a) of Title 18 of the United States Code demand that a hearing on a defendant's competence be held whenever reasonable cause exists to believe that a defendant may not be competent to proceed to trial or to enter a guilty plea.

Here, no hearing occurred, despite evidence creating reasonable cause to believe that Appellant Andrew Wingo might not have been competent to proceed. We therefore hold that the district court did not satisfy its duty under 18 U.S.C. § 4241(a). We remand this case to the district court so that it can determine whether Wingo's competency at the time of his guilty plea can be evaluated *nunc pro tunc*, and if so, for an assessment of his competency at the time of his guilty plea and sentencing. If Wingo is determined to have been incompetent, or if a *nunc pro tunc* evaluation cannot be made, Wingo's conviction and sentence must be vacated, subject to the government's right to try him should he become competent. On the

2

other hand, if Wingo is determined to have been competent, his conviction and sentence must be affirmed.

# I.

## A.

In October 2007, the Federal Bureau of Investigation ("FBI") began investigating Wingo, his parents, and a business associate regarding a fraud and money-laundering scheme thought to have begun in 2003, stemming from their operation of a charitable not-for-profit organization, Angel Food Ministries ("AFM"). The investigation concluded that Wingo engaged in various schemes to fraudulently divert monies from AFM for his own personal use, resulting in laundered funds of up to $2.4 million.

## B.

On November 29, 2011, a federal grand jury sitting in the Middle District of Georgia returned a 49-count indictment related to the AFM fraud, charging Wingo in 44 of the counts. Specifically, Wingo was charged with (1) conspiracy to commit wire fraud, mail fraud, theft from an organization receiving federal funds, interstate transportation of stolen property, and tampering with a witness, in violation of 18 U.S.C. §§ 371, 666, 1341, 1343, 1349, 1512, and 2314 (Count 1); (2) 23 counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts 2-24); (3) fifteen counts of money laundering, in violation of 18 U.S.C. § 1957 (Counts 25-

3

39); (4) conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count 40); and (5) four counts of interstate transportation of stolen property, in violation of 18 U.S.C. § 2314 (Counts 43-46).

At Wingo's initial appearance on December 1, 2011, Wingo proceeded *pro se*. The government noted that Wingo had an extensive gun collection and asked that Wingo not be allowed to possess firearms, as a condition of bond. Wingo stated that he had no objection to this condition because he no longer had a gun collection. A lawyer was appointed to represent Wingo at Wingo's December 13, 2011, arraignment.

Shortly thereafter, on January 10, 2012, Wingo, along with his co-defendants[1] and the government, jointly moved the district court to declare the case complex, pursuant to 18 U.S.C. § 3161(h)(7)(B), citing the complexity and number of alleged violations of federal law, the anticipated 440 million pages of discovery (two terabytes of electronically stored information), and the locations of evidence and witnesses outside the state of Georgia.

The court held a status conference on February 1, 2012, to address the motion. The government informed the court that an FBI agent and an IRS agent had been reviewing discovery documents for three years and that it expected its

---

[1] Co-defendant Joe Wingo did not join the motion.

4

case alone to last three to four weeks if tried.  The court granted the motion to declare the case complex.

Meanwhile, a bond-revocation hearing occurred on January 17, 2012, after the government discovered that Wingo had violated the terms of his pretrial release by possessing three firearms at his residence.  In support of Wingo's claim that he forgot about the firearms, Wingo's wife testified before the magistrate judge that Wingo suffered from early-onset dementia, which resulted in memory loss, sleepingwalking, insomnia, and forgetfulness.  For example, Mrs. Wingo stated that Wingo "does things at night and he cannot remember it.  He takes things out of cabinets and it's just there in the morning when I wake up and he doesn't remember doing it."  She also testified that Wingo would often forget where he was when he was driving, even when he was in his own neighborhood, and that he would be unable to find his way home.  One time, she added, he ran out of gas.  As a result of Wingo's problems, Mrs. Wingo explained, Wingo's neurologist had taken away his driver's license.

The magistrate judge revoked Wingo's bail.  In his order, the magistrate judge summarized Mrs. Wingo's testimony regarding Wingo's mental state: "[Mrs. Wingo] explained that [Wingo] suffers from early onset dementia.  As a result of this condition, he suffers from memory problems, sometimes forgetting where he is or where he is going."

5

Wingo appealed his bail revocation to the district judge, who, on *de novo* review, affirmed. In doing so, the district judge noted Mrs. Wingo's testimony that Wingo suffered from early-onset dementia but discounted its role in Wingo's violation of his bond conditions, as Wingo had not "introduced any medical evidence to support such a conclusion."

On January 30, 2012, approximately two weeks after Wingo's bail was revoked, Wingo filed an emergency motion for adequate medical care. In his motion, Wingo informed the court that he suffered from a congenital medical condition that resulted in the surgical implantation of a shunt in his skull, which required manual fluid draining.[2] Although the motion was denied, Wingo's counsel explained during the hearing that she filed the motion in part to ensure that the detention-center physician and Wingo's surgeon would correspond, as the medical records indicated that Wingo's "[c]ognitive [p]erformance showed some memory deficits," and she had doubts about Wingo's ability to properly communicate his medical needs to the detention-center medical personnel.

Over the next several months, the district court held additional status conferences. At one, the government stated that it had made a plea offer to Wingo,

---

[2] In 2011, Wingo had a ventriculoperitoneal shunt implanted in an effort to alleviate some of the cerebral spinal fluid pressure that he experienced as a result of his congenital condition of craniosynostosis. *See infra* at 9.

and Wingo's counsel indicated that Wingo was willing to accept the agreement but that she and Wingo needed additional time to review documents prior to sentencing. The government stresses that at no time during any of these conferences "did counsel for Wingo suggest that Wingo's medical condition was having the effect of rendering him mentally incompetent."

Wingo and the government eventually reached a Rule 11(c)(1)(C) plea agreement that stipulated that Wingo would plead guilty to a single count of conspiracy to commit money laundering (Count 40 of the indictment) if the district court imposed a sentence of no more than 84 months' imprisonment.[3]

On February 25, 2013, Wingo appeared at a change-of-plea hearing with his lawyer. At the hearing, the court asked Wingo's counsel, "To your knowledge, is he competent to enter a free and voluntary plea of guilty today?" Wingo's counsel replied, "Yes, Sir." The court then asked, "And to your knowledge, does he understand the consequences of pleading guilty?" Wingo's counsel again replied, "Yes, Sir." Similarly, after the court explained to Wingo all of his rights, Wingo indicated that he did not have any questions and that he was not confused by anything said during the hearing. Wingo's counsel did not add anything on behalf of Wingo after being provided with the opportunity to do so by the court. The court then found Wingo "fully competent and capable of entering an informed

---

[3] Otherwise, the charge carried a maximum sentence of 120 months.

7

plea" and accordingly accepted his knowing and voluntary guilty plea.  The court adjudged Wingo guilty but did not at that time accept the binding Rule 11(c)(l)(C) plea agreement.

On August 19, 2013, ten days before sentencing, Wingo's counsel submitted a sentencing memorandum requesting a thirty-month sentence.  She based her motion on Wingo's "diminished mental capacity; and his aberrant behavior in this case."  In support of the sentencing request, Wingo's counsel attached exhibits, including certain reports and video interviews[4] prepared by physicians.

## C.

Because an understanding of the record evidence regarding Wingo's health is crucial to our decision today, we review that information in significant detail.

The medical records and reports attached to Wingo's sentencing memorandum included information from these physicians:  Michael Foley, M.D., a radiologist; Jeffrey Danziger, M.D., a forensic psychiatrist; Peter Ash, M.D., the Chief of Child and Adolescent Psychiatry and the Director of Psychiatry and Law Service at the Emory University School of Medicine; and Eric L. Mings, Ph.D., a psychologist.  Walter E. Afield, M.D., of the Neuropsychiatric Institute, also examined Wingo.

---

[4] The video interviews were submitted separately, two days before the sentencing hearing.

That information revealed the following about Wingo's medical condition. At nine months old, Wingo was diagnosed with a congenital abnormality known as craniosynostosis. Ordinarily, at birth, the joints between bones in the upper skull are open, which allows the skull to grow in order to provide space for the developing brain, but in craniosynostosis, the sutures of the skull are fused at birth. To address the problem that craniosynostosis presents, generally surgery is performed in infancy, opening the skull to allow the brain to grow. Wingo, in fact, had such surgery.

Despite this surgery as an infant, in 2000, an MRI showed that Wingo's brain had pulled away from his skull, and mild atrophic changes were present in the high parietal region. Around that same time, Wingo had two additional surgeries related to his craniosynostosis.

By 2007, Wingo was undergoing regular spinal taps every four to eight weeks to relieve his severe cerebral spinal fluid pressure, which generally ran about twice the normal pressure and sometimes higher.[5] According to Wingo's physician at that time, Dr. Steven Taraszka, when Wingo presented himself for his spinal taps, "his thinking [was] very cloudy and he seem[ed] obtunded." At the

---

[5] Around this time, Wingo was also diagnosed with post-traumatic stress symptoms relating to recurring memories of sexual abuse as a child. He received out-patient treatment for that condition.

end of 2007, Dr. Taraszka stopped practicing, and Wingo had a bad experience receiving a spinal tap from another doctor, so he ceased having the procedure.

In July 2008, another MRI of Wingo's brain was performed. Dr. Foley opined that it demonstrated a "stunning" level of atrophy.

On February 26, 2009, Dr. Afield conducted a neuropsychiatric evaluation of Wingo. He described Wingo as "a very bad historian."[6] As Dr. Afield explained, Wingo could remember only one of three objects after five minutes and was "not able to multitask at all." He diagnosed Wingo with, among other ailments, "congenital abnormalities with subsequent brain dysfunction" and "[c]erebral dysfunction." Overall, Dr. Afield concluded, "This man is clearly impaired and I do not see how he is able to run a business. In fact, I am not sure how he is able to run anything . . . . He apparently is playing with as much of a deck as he has, but it is not a full deck. He is certainly a rather simple soul in many ways."

On March 3, 2009, a Single Photon Emission Computed Tomography (SPECT) scan of Wingo was performed. It demonstrated large areas of markedly decreased and abnormal brain activity. Dr. Foley described Wingo's "significant abnormality" as "one of the worst scans [he had] ever seen in [his] life." As Dr.

---

[6] Dr. Afield elaborated, "A month ago, he shaved his head. He has been acting rather bizarrely, really since he took over this position [with AFM]. He has made some rather stupid decisions. He liked to buy guns for some reason. He bought something like 300 guns and then opened a store to sell them . . . . That does not seem to make much sense and, as I say, he was a terrible historian."

10

Ash understood the findings, "the periods of high [cerebral spinal fluid] pressure in [Wingo's] enclosed skull compressed the brain tissue, leading to death of nerve cells." Dr. Afield similarly construed the SPECT scan to show "brain damage in the areas that deal with judgment, thinking and concentration. . . . [I]t clearly is understandable why he would be using bad judgment."

Dr. Mings conducted neuropsychological testing of Wingo on July 8, 2009. He also reviewed Wingo's medical records and interviewed people who interacted regularly with Wingo to obtain their observations of his behavior, which Dr. Mings incorporated into his neuropsychological evaluation report. With respect to the mental status examination that Dr. Mings performed, Dr. Mings interviewed Wingo; administered several psychological tests on Wingo, including the Test of Memory Malingering, Trails A and B, the Wisconsin Card Sorting Test, a verbal fluency task test, and the Minnesota Multiphasic Personality Inventory; and reviewed the raw data of the Wechsler Adult Intelligence Scale III testing that Dr. Afield had conducted on Wingo in February 2009.

As for the interviews that Dr. Mings conducted, consistent with her later testimony at Wingo's bond-revocation hearing, Wingo's wife reported to Dr. Mings that in about 2007, Wingo's memory problems significantly worsened. According to her, he would forget where he was going while driving and would

become lost, even in a familiar area, and he had been having difficulty performing common tasks like signing his name.

Dr. Taraszka, whom Dr. Mings also interviewed in the course of his evaluation of Wingo, contrasted Wingo's friendly behavior in the early years of their relationship with his conduct later in their relationship. He said that while they used to communicate frequently, Wingo had withdrawn from almost all communication and had stopped responding to Dr. Taraszka's telephone calls. During Dr. Taraszka's more recent interactions with Wingo, Dr. Taraszka found that Wingo could "make small talk but that is where it ends now," and he described Wingo as "appearing spac[]y" during their last interaction.

Pastor Johnny Willis, who had worked with Wingo at AFM, observed "rather dramatic changes" in Wingo, in that, uncharacteristically, Wingo started to "forget about things despite being reminded several times during the day and failed to follow through with commitments that he ma[de]." Willis further explained that Wingo's conversations "began to be scattered and he was not able to focus on the topic at hand."

Mike Benton, who also worked at AFM, noticed similar problems, reporting that in the later years of his relationship with Wingo, Wingo would at times "not pay[] attention to people [and would] change gears and walk off from conversations." The others who Dr. Mings interviewed told of similar problems.

Based on the entirety of his evaluation, Dr. Mings found that Wingo showed "clear evidence of significant cognitive impairment which is very likely the result of a progressive dementia associated with the effects of his lifelong craniosynostosis and numerous recent complications, particularly the effects of the inability to control his cerebral spinal fluid pressure." Dr. Mings commented that Wingo's problems manifested themselves in "significant memory problems," problems "maintaining attention and focus for more than a short period of time," and problems with "conceptual . . . abilities." As a result, in 2009, Dr. Mings diagnosed Wingo with, among other ailments, dementia, and opined,

> I do have significant concerns about his competency to proceed if charges are ultimately filed against him. I do not doubt that he has the capacity to understand the basic adversary nature of the legal process and roles of the various participants. However, I have serious reservations about his capacity to meaningfully participate in his defense due to his unstable medical and psychiatric condition. I think it would be extremely difficult to envision him consistently and actively participating with his attorneys in planning a defense to a complicated legal situation given the severe chronic debilitating headaches and the cognitive deficits observed by others and evident on neuropsychological assessment.

On October 13, 2010, Dr. Ash prepared his report of his examination of Wingo and his medical records. Dr. Ash considered several things in forming his opinion: a DVD containing interviews of Dr. Danziger, Dr. Mings, and Dr. Foley;

13

medical records from Dr. Mings, Dr. Afield, Dr. Taraszka, Dr. Foley, Dr. Claire,[7] and Daniel Barrow, M.D.; interviews of Wingo; and interactions that he observed occurring between Wingo and Richard Rhodes (Wingo's attorney before Wingo was indicted) that Dr. Ash observed.  Based on his evaluation, Dr. Ash concluded that, among other problems, Wingo suffers from dementia and "craniosynostosis associated with blockage of normal [cerebral spinal fluid] drainage resulting in hydrocephalus with findings of significant brain atrophy and memory impairment."

Although Dr. Ash stated that Wingo understood the nature of the proceedings against him, Dr. Ash observed that Wingo gave "vague responses" to Rhodes's questions and had difficulty providing details about financial transactions that potentially related to the government's investigation.  Dr. Ash also reported that Wingo had authentic memory and attention problems and ultimately concluded that although Wingo would "probably be competent to stand trial" if the case involved "a relatively short trial that was focused on a single event," "for a complex case that could result in an extended trial, [Wingo's] cognitive limitations become much more significant."  Dr. Ash opined,

> [Wingo's] memory impairments severely impair his
> ability to assist his attorney in understanding details of
> transactions and conversations in preparing for trial, they
> would impair Mr. Wingo's testifying about such details,

---

[7] The file does not appear to contain Dr. Claire's first name or his or her degree.  Dr. Claire's records pertain to the period from 2004 through 2006.

14

and they would impair his commenting to his attorney on testimony that others might give on those issues.

\*\*\*

With regard to Mr. Wingo's impairments in sustained attention during an extended trial, in my opinion they are of such severity that he would be unable to attend sufficiently to much of the trial and so would be unable to effectively assist his attorney.  In my opinion, to a reasonable degree of medical certainty, at the time of the evaluation, Mr. Wingo was not competent to stand trial in a trial that would require sustained attention over several weeks duration.

In addition to the medical records and reports reviewed above, Wingo's counsel attached to Wingo's sentencing memorandum several letters from friends, family, and business associates.  Many of the letters expressed observations that, in the prior few years, Wingo had markedly changed.  For instance, according to Terry Morrow, a friend of Wingo's, at some point after 2005, Wingo's health began to deteriorate, and he became "more and more irrational and self-serving." Mark Barclay, another friend, stated that Wingo began to exhibit "increasing confusion and disorientation," as well as a "lack of concentration."  Zona Hayes-Morrow, who worked with Wingo when her church became a distribution site for AFM, wrote that after Wingo developed health problems, he became "increasingly emotionally and mentally volatile and was making poor decisions personally and professionally."  Similarly, William Todd, who worked with Wingo at AFM, reported that Wingo would "get forgetful and disoriented."  And Lillian Roxanna

15

Brogan, another AFM colleague, recounted a "change" in Wingo since 2007, explaining that she "first noticed that he was forgetting a lot of stuff, some minor as well as major. . . . [H]e started to forget things he said or did that I witnessed." Wingo's counsel also included a letter submitted by Wingo's wife, which echoed the testimony that she had provided at Wingo's bond-revocation hearing. Other friends and family noted that Wingo's medical condition affected his mental capacity, judgment, memory, and behavior.

Prior to the sentencing hearing, the district court also received and reviewed a pre-sentence investigation report, which summarized Wingo's craniosynostosis, the physical and mental problems he experienced as a result of the condition, and the findings by Dr. Mings, Dr. Foley, and Dr. Afield.

**D.**

The sentencing hearing occurred on August 29, 2013. At the hearing, the district court acknowledged that it had received Wingo's memorandum, including the attached medical records, evaluations, and letters, and the videotaped medical interviews. The district judge stated, "I have taken into consideration [Wingo's] medical condition. I think I understand it. However, I don't think that serves as a basis to reduce his sentence in this case. I think he can be taken care of in the prison sentence." The court then sentenced Wingo to 84 months, the maximum allowed by the conditional Rule 11(c)(1)(C) plea agreement. The district court

entered final judgment on September 16, 2013.  On September 27, 2013, Wingo timely filed a notice of appeal.[8]  He now argues that the government violated his statutory and constitutional procedural-due-process rights[9] by failing to request a competency hearing, and alternatively, that the court violated his statutory due-process rights by failing to *sua sponte* order a competency hearing, because both the government and the court had reasonable cause to doubt his competence.

## II.

Competence to proceed to trial or to enter a guilty plea, *United States v. Rodriguez*, 751 F.3d 1244, 1252 (11th Cir. 2014), requires the defendant to possess the "capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense . . . ."  *Drope v. Missouri*, 420 U.S. 162, 171, 95 S. Ct. 896, 903 (1975).  Every defendant has a substantive fundamental right under the Due Process Clause not to be tried or convicted while incompetent.  *See Cooper v. Oklahoma*, 517 U.S. 348, 354, 363, 116 S. Ct. 1373, 1376, 1381 (1996).

---

[8] Wingo's sentence appeal waiver cannot bar his claim that he was incompetent to plead guilty and face sentencing. Wingo' s appeal waiver itself would be invalid if he lacked the mental capacity to understand and appreciate the nature and consequences of the plea agreement. *See Carroll v. Beto*, 421 F.2d 1065, 1067 (5th Cir. 1970) (holding that an incompetent defendant cannot waive his constitutional due process rights, "by guilty plea or otherwise").  Pursuant to *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), opinions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit.

[9] Wingo's brief states that he appeals based on a violation of his procedural due-process rights.  We interpret Wingo's appeal as asserting both constitutional and statutory violations.

17

At least two major reasons for this right have been advanced. First, without competence, a defendant cannot meaningfully exercise his other constitutionally guaranteed rights. *See Cooper*, 517 U.S. at 354, 116 S. Ct. at 1376 (quoting *Riggins v. Nevada*, 504 U.S. 127, 139, 112 S. Ct. 1810, 1817 (1992) (Kennedy, J., concurring in the judgment) ("Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel . . . .")). And second, trying an incompetent defendant is like trying an absent defendant; "the mentally incompetent defendant, though physically present in the courtroom, is in reality afforded no opportunity to defend himself." *Drope*, 420 U.S. at 171, 95 S. Ct. at 903-04 (citation and internal quotation marks omitted). In other words, it is fundamentally unfair to try an incompetent defendant. *See Cooper*, 517 U.S. at 364, 116 S. Ct. at 1382. So our Constitution "jealously guard[s]" an incompetent criminal defendant's fundamental right not to stand trial or be convicted. *See id.* at 363, 116 S. Ct. at 1381 (quoting *Jacob v. New York City*, 315 U.S. 752, 752-53, 62 S. Ct. 854, 854-55 (1942) (internal quotation marks omitted)).

It does this through not only the substantive right not to be tried or convicted while incompetent but also the procedural right under the Due Process Clause to "adequate" procedures to protect the right not to be tried or convicted while incompetent. *Pate v. Robinson*, 383 U.S. 375, 378, 86 S. Ct. 836, 838 (1966); *see*

18

*also James v. Singletary*, 957 F.2d 1562, 1569-71 (11th Cir. 1992).  To comply with a defendant's procedural right, once the court learns of information that raises a "bona fide doubt regarding [the defendant's] competence," *James*, 957 F.2d at 1570, the court must apply adequate procedures to ascertain whether the defendant is competent to proceed to trial or the entry of a guilty plea.  *See Pate*, 383 U.S. 375, 384-86, 86 S. Ct. 836, 841-42.  And it must do so even in the absence of a demand by the defendant to determine his competency.  *Cooper*, 517 U.S. at 354 n.4, 116 S. Ct. at 1377 n.4; *Pate*, 383 U.S. at 384, 86 S. Ct. at 841.  For, as we have discussed, the right to be competent at trial and when convicted—whether through trial or plea—is fundamental, *see Cooper*, 517 U.S. at 354, 116 S. Ct. at 1376-77, and an incompetent defendant is, by definition, not capable of knowingly and intelligently waiving his right to a determination of competency, *see Pate*, 383 U.S. at 384, 86 S. Ct. at 841.

Title 18, United States Code, Section 4241 sets forth the procedures for a federal court to follow once it has reason to believe that a defendant may be incompetent to proceed to trial or to be convicted.  In pertinent part, it provides,

> **Motion to determine competency of defendant.**—At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, . . . the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant.  The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant

19

> may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

18 U.S.C. § 4241(a) (emphasis added).

We begin our statutory analysis with the plain language of the statute; since it is clear, we also end our analysis there. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S. Ct. 1026, 1030 (1989).  The plain language of Section 4241(a)—the court "shall order . . . a hearing on its own motion"—is unambiguous about the court's obligation to *sua sponte* hold a hearing if it has "reasonable cause" to believe that the defendant "may" be incompetent; the court must conduct a hearing under those circumstances. *Tiller v. Esposito*, 911 F.2d 575, 576 (11th Cir. 1990); *see also Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35, 118 S. Ct. 956, 962 (1998) (citation omitted) (the "mandatory 'shall[]' . . . normally creates an obligation impervious to judicial discretion.").

The only question that Section 4241(a) does not answer about the court's duty to *sua sponte* conduct a hearing is what constitutes "reasonable cause to believe that a defendant may [be incompetent]."  But our caselaw does.

We have identified three factors to be considered in determining whether information that a court has establishes a "bona fide doubt regarding the defendant's competence": "(1) evidence of the defendant's irrational behavior; (2)

20

the defendant's demeanor at trial; and (3) prior medical opinion regarding the defendant's competence to stand trial." *Tiller*, 911 F.2d at 576. And we have found that the "bona fide doubt" standard satisfies Section 4241(a)'s "reasonable cause" requirement. *United States v. Nickels*, 324 F.3d 1250, 1251-52 (11th Cir. 2003) (per curiam).

In explaining the "bona fide doubt" inquiry, the Supreme Court has emphasized that a court must consider the aggregate of evidence pertaining to all three prongs and not evaluate each prong in a vacuum. *Drope*, 420 U.S. at 180, 95 S. Ct. at 908. Nevertheless, because "[t]here are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed," evidence under a single prong of the test—even standing alone—"may, in some circumstances, be sufficient" to establish a bona fide doubt about a defendant's competence. *Id.*

We review for abuse of discretion a district court's failure to *sua sponte* order a hearing on the defendant's competency under Section 4241. *United States v. Williams,* 468 F.2d 819, 820 (5th Cir. 1972).[10]

---

[10] Though *Williams* construed an earlier version of the law currently codified at § 4241, both iterations of the statute impose the same duty on the district court to inquire *sua sponte* into a defendant's mental competency. *See* 18 U.S.C. § 4244 (1949) (current version at 18 U.S.C. § 4241) ("[U]pon its own motion [to determine competency of the defendant to proceed], the court shall cause the accused, whether or not previously admitted to bail, to be examined as to his mental condition by at least one qualified psychiatrist, who shall report to the court.").

Here, the combined evidence under two of the three prongs created reasonable cause to believe that Wingo was incompetent to proceed to trial or to plead guilty. First, the evidence concerning prior medical opinion strongly suggested that Wingo might not be competent to assist counsel. Every physician who examined Wingo's brain from 2007 on found extensive organic brain damage, as a result of Wingo's craniosynostosis and the complications arising from it. Indeed, about the organic damage alone, Dr. Foley described Wingo's brain as showing "significant abnormality" and "stunning" atrophy, and he opined that Wingo's SPECT exam was "one of the worst scans [he had] ever seen in [his] life."

And the physicians' concerns did not end with their analysis of the physical and organic condition of Wingo's brain. At least three medical doctors expressed serious doubts about Wingo's competence. Both Dr. Ash and Dr. Mings specifically voiced concern about Wingo's ability to assist counsel in a complex case, which Wingo's—a case that involved multiple counts concerning a fraud that the FBI and IRS had investigated for three years and had collected hundreds of millions of documents in support of the government's case—clearly was. Similarly, based on his professional interactions with Wingo, Dr. Afield opined that Wingo was "clearly impaired" and that he was not "playing with . . . a full deck." These medical opinions loudly signaled that Wingo might well not have

22

been able to "assist properly" in his defense in this case, which both the government and defendants agreed was complex. Nor did any medical evidence of record at all contradict the multiple doctors' findings regarding Wingo's physical and mental condition. And the medical evidence filled in a critical gap that the district court had pointed out was previously lacking when it rejected Wingo's appeal from the revocation of his bail because Wingo had not "introduced any medical evidence . . . ."

Second, evidence of irrational behavior under the "bona fide doubt" test provides real-world support for the doctors' findings and conclusions. Beginning with Wingo's bond-revocation hearing, the court succinctly summarized Mrs. Wingo's testimony, noting that she stated that she "live[d] in a house with a man who . . . admittedly has early onset dementia, does things at night he can't even remember doing, . . . sometimes he forgets where he is, that he's taking narcotic medication, psychotropic medication, Percocet, Prozac, Ambien, Baclofen, Diamox, and he is living in a house where there are guns, knives and ammunition strewn about the house." Additionally, Wingo's wife testified that Wingo could not find his way home in a neighborhood where he had lived for years and that Wingo's neurologist had taken away his driver's license for six months while he attempted to figure out what was causing Wingo's irregular behaviors.

Mrs. Wingo was not alone in her observations of Wingo's unusual conduct. Numerous others who had had regular interaction with Wingo reported that, in recent years, Wingo had become "more and more irrational," had exhibited "increasing confusion and disorientation," had been extremely forgetful, and had become quite withdrawn.

On this record, even Wingo's apparently normal demeanor in his short and limited court appearances—the last of the prongs under the "bona fide doubt" test—could not in this complex case sufficiently ameliorate the reasonable cause to believe that Wingo might be incompetent to plead guilty, created by the strong medical evidence and corroborated by multiple witnesses' anecdotes about their real-world interactions with Wingo. *See, e.g., Pate*, 383 U.S. at 385-86, 86 S. Ct. at 842 ("The Supreme Court of Illinois held that the evidence here was not sufficient to require a hearing in light of the mental alertness and understanding displayed in Robinson's 'colloquies' with the trial judge. . . .  But this reasoning offers no justification for ignoring the uncontradicted testimony of Robinson's history of pronounced irrational behavior.  While Robinson's demeanor at trial might be relevant to the ultimate decision as to his sanity, it cannot be relied upon to dispense with a hearing on that very issue.").

Nor, under these circumstances, could Wingo's counsel's failure to raise Wingo's competency relieve the court of its responsibility to do so.  While we have

24

said that counsel's failure to raise the competency issue can be persuasive evidence that competency is not in doubt,[11] *United States v. Rodriguez*, 799 F. 2d 649, 655 (11th Cir. 1986) (per curiam), it cannot be conclusive evidence that competency is not in doubt.  If it were, the mandatory requirement in § 4241 for a court to *sua sponte* address the issue of a defendant's competency would be meaningless because a court would never be obligated to consider the issue if defense counsel did not first raise it.  But "we avoid statutory constructions that render provisions meaningless."  *Bouchard Transp. Co., Inc. v. Updegraff*, 147 F.3d 1344, 1351 (11th Cir. 1998) (citation omitted).

Though cases where counsel fails to bring the competency issue to the court's attention and the court abuses its discretion by not *sua sponte* raising it on its own are perhaps rare, this matter—with copious, objective medical evidence of organic brain damage, as well as medical and lay evidence suggesting corresponding mental incompetence—is one of those cases.  Indeed, the robust record evidence of possible incompetency necessarily eclipses counsel's failure to raise Wingo's competency.

---

[11] Section 4241(a) provides that "the defendant . . . may file a motion for a hearing to determine the mental competency of the defendant."  So defense counsel who has reasonable cause to believe that her client may be incompetent should certainly bring her concern to the court's attention, but if she does not, where reasonable cause exists to believe that a defendant may not be competent, the court acts as a safety net and must hold a hearing on the defendant's competence.

We have explained that, under these circumstances, the proper remedy is to remand the case to the district court for a determination of whether a meaningful inquiry may be made into the defendant's competency at the time of the guilty plea. *Acosta v. Turner*, 666 F.2d 949, 956 (5th Cir. Unit B 1982)[12]; *United States v. McEachern*, 465 F.2d 833, 839-40 (5th Cir. 1972). To make this evaluation, the district court should consider "whether the 'quantity and quality of available evidence [of the defendant's competency at the time of the trial or guilty plea] is adequate to arrive at an assessment that could be labelled as more than mere speculation.'" *Martin v. Estelle*, 583 F.2d 1373, 1374 (5th Cir. 1978) (citation omitted). If a meaningful inquiry into Wingo's competency can be conducted, the district court must determine Wingo's competency at the time that he pled guilty. *Id.* If not, or if after a meaningful hearing Wingo is found to have been incompetent at the time of his guilty plea, the guilty plea must be vacated, subject to the government's right to try Wingo at such time that Wingo is competent. *See United States v. Makris*, 483 F.2d 1082, 1092 (5th Cir. 1973). In remanding this case, we opine on neither whether a meaningful *nunc pro tunc* inquiry into Wingo's competency at the time of his guilty plea may be made nor whether, if so, Wingo was competent. Rather, we hold simply that the evidence in the record

---

[12] Decisions rendered by Unit B of the former Fifth Circuit constitute binding precedent in the Eleventh Circuit, regardless of the date of issuance. *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

26

before sentencing presented reasonable cause to believe that Wingo might have been incompetent to assist in his own defense, so it necessitated a hearing under § 4241.

We recognize that the district court could not possibly have known the extent of Wingo's mental health until counsel filed Wingo's sentencing memorandum containing the majority of the evidence relevant to his competency. And even then, the focus of the sentencing memorandum was directed towards obtaining a reduced sentence for alleged diminished capacity. So we can understand how this issue may have escaped the district court's attention.[13] Nevertheless, that does not make the district court's failure to *sua sponte* inquire into Wingo's competency any less an abuse of discretion.

## III.

In sum, we hold that the court abused its discretion in not *sua sponte* conducting a competency hearing because reasonable cause to believe that Wingo might be incompetent exists on this record. We remand the case to the district

---

[13] The government, on the other hand, well before indictment did possess the records that Wingo's trial counsel ultimately attached to the sentencing memorandum. We know this because Richard Rhodes, Wingo's attorney until just before indictment, attested that he provided them to the government at that time. Rhodes also specifically raised Wingo's competency with the government and even offered to have Wingo examined at a federal facility, at Wingo's expense. While the record shows that the government passed on copies of Wingo's records to Wingo's court-appointed attorney after she was appointed to represent Wingo, the record contains no evidence that she was aware of Rhodes's offer. Wingo has asserted that, under these circumstances, the government was required to raise the competency issue with the court. Because we decide this case on the court's obligations under § 4241, we do not opine on what, if any, statutory or constitutional responsibilities the government or Wingo's counsel may have had to raise the competency issue.

court so that it can determine whether Wingo's competency can be evaluated *nunc pro tunc*, and if so, for an assessment of his competency at the time of his guilty plea and sentencing. If Wingo is determined to have been incompetent, or if a *nunc pro tunc* evaluation cannot be made, Wingo's conviction and sentence must be vacated, subject to the government's right to try him should he become competent. On the other hand, if Wingo is determined to have been competent, then his conviction and sentence must be affirmed.

**REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**