[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 17-12316
Non-Argument Calendar

————————————————

D.C. Docket No. 6:16-cr-00083-RBD-GJK-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KENNEDY HARRIS, JR.,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————————

(July 9, 2018)

Before MARTIN, HULL, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Kennedy Harris Jr. appeals his 360-month sentence, imposed after a jury

convicted him of sex trafficking of a minor child, in violation of 18 U.S.C.

§ 1591(a), (b)(1), as well as employing, using, persuading, inducing, enticing, or coercing a minor to engage in sexually explicit conduct for the purposes of producing child pornography, in violation of 18 U.S.C. § 2251(a).  On appeal, Harris argues the district court abused its discretion when it declined to continue his sentencing so he could have a full competency evaluation, with a hearing, after his attorney told the court there were questions about Harris's competency.  He also argues that his sentence is substantively unreasonable in light of the totality of the circumstances and the 18 U.S.C. § 3553(a) factors.  After careful review, we affirm.

## I.

On October 29, 2016, Harris was convicted of sex trafficking a minor child and inducing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction.  According to the Presentence Investigation Report ("PSR"), Harris encountered S.W., a sixteen-year old girl who had run away from home, and offered to take care of her.  S.W. told officers that Harris took sexually suggestive photos of her and uploaded them to Backpage.com.  S.W. said that for about two weeks, Harris made her have sex with four or five male customers per day and then give the money she earned to him.  Harris in turn provided S.W. with crack cocaine.  Harris told another witness he thought he was able to make so much money off of S.W. because she looked so young.

2

After the verdict but before sentencing, Harris's trial counsel filed a motion to withdraw based on irreconcilable differences, which the magistrate judge granted. Harris's new attorney moved to continue sentencing a number of times, citing a need to familiarize himself with the trial record and to evaluate possible mitigation evidence. In one motion, counsel said he had intended to pursue a competency evaluation of Harris, but that he "no longer is of the opinion that competency is an issue based upon his interaction with the Defendant."

Harris's PSR calculated his advisory guideline range to be life imprisonment. The PSR also described Harris as receiving Social Security disability benefits since age 5 "due to learning disabilities." The PSR reported that Harris said he could not read, write, or spell, and suffered from anxiety and panic attacks.

Harris's attorney moved for a downward departure. In support, he attached an evaluation from 2011 that described Harris as having an IQ score of 55, meaning his "level of intellectual functioning is equal to or better than that of 0.1 percent of same-age peers." Also attached was documentation that Harris qualified for Social Security disability payments "for attention deficit hyperactivity disorder and mental retardation."

Harris's sentencing hearing was held on May 15, 2017.  At the hearing, Harris's attorney asked to speak with the court on an ex parte basis.  Counsel told the judge he was "not comfortable going forward today."  Counsel said:

> I'm not sure that he understands—I've had plenty of clients that don't agree with my advice.  But this just feels different.  And it's not that he does not just solely disagree.  I don't and I'm not convinced that he understands what I'm telling him, Judge.  I've provided objective documentation to show that he has a very, very low ability to understand.  He has a very low functioning level.

After the court asked him to clarify, counsel said: "I don't know that [Harris is] capable of following my advice.  And so the only thing that I would think to be prudent is to have a competency evaluation done, a thorough one."  Counsel said he had met with Harris approximately ten times before the sentencing hearing.  Counsel said a competency evaluation had not been completed before because Harris had previously refused to meet with a doctor, but that Harris had finally agreed to meet with a doctor the weekend before sentencing.  Counsel said the doctor had not completed a formal evaluation but provided notes from his meeting with Harris.  Counsel concluded:

> [B]ased on my discussion with him this afternoon . . . and his reaction, based on my discussion with his family prior to today and last week— on last Wednesday, I believe it was—I just don't think it's the right thing for me to not bring it to the Court's attention.  And I don't think it's the right thing for him to not at least be evaluated.

The court noted that he had presided over Harris's trial and conducted a colloquy with him about his choice not to testify, and that he had had no concerns

4

during trial that Harris might not be competent to proceed.  The sentencing judge

then addressed Harris:

> THE COURT: Do you understand why you're here in the court today?
> THE DEFENDANT: No, sir.
> THE COURT: Pardon me?
> THE DEFENDANT: No, sir.
> THE COURT: You don't know that you're here for sentencing?
> THE DEFENDANT: No, sir.  I don't know what's going on.  I just know I'm here today.

The court then brought the government back in.  The court stated that it did not

find Harris's statement to be "particularly credible," but had decided "to continue

the sentencing with some regret" so Harris's competency could be evaluated.

The government opposed the continuance.  The government noted that

Harris's sentencing hearing had been continued a number of times, ostensibly to

perform a competency hearing and gather mitigation evidence.  The government

admitted it had no evidence of Harris's "particular state of mind today," but

offered recordings of jail calls to dispute Harris's claims of incompetence.

In particular, the court listened to the recording of a call Harris placed from

jail on February 17, 2017, about three months before sentencing.  On this call,

Harris said the government was "trying to give me life."  He clarified that he

hadn't received a life sentence, but "that's what the guidelines came out to."  He

said the probation officer had recommended a life sentence in his report, but that

the sentence was ultimately "up to the judge."  Harris said there was information in

5

the PSR that wasn't presented at trial, and that his attorney was going to object to it.

After reviewing the recordings and other evidence in the record, the court denied the motion to continue sentencing. The court noted that more than ample time had been allowed in order for a competency hearing to be conducted. The court said it had reviewed letters submitted on Harris's behalf, and while some suggested "he may not be—and I'm quoting now—the sharpest crayon in the box, closed quote, none of those letters suggest that Mr. Harris has any type of intellectual infirmity that would prevent him from being competent to proceed with sentencing." The court said it was especially persuaded by the February 2017 phone call recording that Harris was competent to proceed. And while Harris had said that he did not understand the sentencing procedure, the court said "everything else about his demeanor and his response to that question suggests to me otherwise." The court said "it's my assessment that Harris is attempting to manipulate the circumstances to obtain a continuance. And I'm not going to grant it."

The court proceeded to sentence Harris. The government asked for a one-level downward variance, suggesting that a life sentence was harsher than necessary given the facts of the case. The government suggested that a sentence between 30 and 40 years would be appropriate. Defense counsel argued that

Harris's young age and low mental functioning warranted an even further downward departure. He asked that the court sentence Harris to the mandatory minimum 15-years imprisonment. The court then addressed Harris. Harris said, "I'm just telling you, sir, I don't really in my heart—I don't really know what's going on right now. I'm just lost. Really, I'm asking you to help me because I don't know what's going on. I don't understand nothing."

The court sentenced Harris to 360-months imprisonment. In doing so, the court said it considered the § 3553 factors. In particular, the court noted Mr. Harris's age and his diminished mental capacity on the one hand, and on the other hand, Mr. Harris's long criminal history and the seriousness of the crime, which the court concluded required a "certain sophistication" to pull off. This appeal followed.

## II.

We review a district court's failure to order a hearing on a defendant's competency for an abuse of discretion. See United States v. Wingo, 789 F.3d 1226, 1236 (11th Cir. 2015).

The Due Process Clause of the Fifth Amendment requires that a defendant be mentally competent to be tried or convicted. United States v. Rodriguez, 751 F.3d 1244, 1252 (11th Cir. 2014). "Whether the defendant is competent is an ongoing inquiry; the defendant must be competent at all stages of trial," including

7

sentencing.  See United States v. Rahim, 431 F.3d 753, 759 (11th Cir. 2005) (per curiam).  The standard of competence is "whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," and whether the defendant has a rational and factual understanding of the criminal proceedings.  Rodriguez, 751 F.3d at 1252 (quotation omitted).  "Evidence of incompetence must indicate a present inability to assist counsel or understand the charges.  Absent evidence of such an inability, evidence of low intelligence, mental deficiency, bizarre, volatile, or irrational behavior, or the use of anti-psychotic drugs is not sufficient to show incompetence to stand trial." Pardo v. Sec'y, Fla. Dep't of Corr., 587 F.3d 1093, 1101 (11th Cir. 2009) (quotation and citation omitted).

Once a district court receives information that "raises a bona fide doubt" about the defendant's competence, the court must follow the procedures set forth in 18 U.S.C. § 4241.  Wingo, 789 F.3d at 1235 (quotation omitted).  Section 4241 provides that:

> At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant . . . the defendant or the attorney for the Government may file a motion to a hearing to determine the mental competency of the defendant.  The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

8

18 U.S.C. § 4241(a).

We consider three factors in determining whether information presented to the district court establishes a bona fide doubt regarding the defendant's competence: "(1) evidence of the defendant's irrational behavior; (2) the defendant's demeanor at trial; and (3) prior medical opinion regarding the defendant's competence to stand trial." Wingo, 789 F.3d at 1236. "[E]ven one of these factors standing alone may, in some circumstances, be sufficient" to create a bona fide doubt regarding competence, but there are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed." Drope v. Missouri, 420 U.S. 162, 180, 95 S. Ct. 896, 908 (1975).

We now apply the three factors to consider whether the district court abused its discretion in finding no bona fide doubt as to Harris's competency. First, as to irrational behavior, Harris put forward no evidence of particular irrational acts. Instead, his attorney expressed concerns about Harris's ability to understand, and Harris himself stated he did not understand the proceedings. But the letters presented on Harris's behalf and the recordings of Harris's calls do not support these claims. In particular, during Harris's February 2017 call he expressed a clear understanding of the sentencing process. Second, as to Harris's demeanor during the proceedings, the court noted it had observed Harris' demeanor and interacted with him throughout trial and had had no concerns about his competency to

9

proceed.  At sentencing, the court also remarked that while Harris said he did not understand what was going on, "everything else about his demeanor and his response to that question suggests to me otherwise."  And third, as to prior medical opinions regarding competence, while Harris's attorney submitted some previous medical evaluations speaking to Harris's low intelligence, none of those records suggested that Harris was incompetent to proceed.  See Pardo, 587 F.3d at 1101.

On this record, we cannot say the district court abused its discretion in declining to order such an evaluation.  In Wingo, this Court concluded that it was an abuse of discretion for a district court not to sua sponte order a competency evaluation when there was "strong medical evidence" to suggest the defendant was incompetent and that evidence was "corroborated by multiple witnesses' anecdotes about their real-world interactions" with the defendant.  Wingo, 789 F.3d at 1237.  No such evidence was presented here.  The statements by Harris's attorney that he did not believe his client to be competent were accompanied by no detail suggesting what led him to that conclusion.  And Harris's statements that he did not understand the sentencing process were contradicted by the recording of his earlier phone call, during which he showed a firm grasp of that process.  While it is true that the competency inquiry is an ongoing one, and a defendant may come in and out of competency, see Drope, 420 U.S. at 181, 95 S. Ct. at 908, Harris presented the court with nothing to suggest his mental condition deteriorated

10

between when he appeared at trial, made his phone calls from jail, and then appeared at sentencing.  In the end, the district court found Harris's statements not to be credible.  Considering all the facts before the court, this was no abuse of discretion.

## III.

We review the reasonableness of a sentence "under a deferential abuse-of-discretion standard."  Gall v. United States, 552 U.S. 38, 41, 128 S. Ct. 586, 591 (2007).  "The review for substantive unreasonableness involves examining the totality of the circumstances, including an inquiry into whether the statutory factors in § 3553(a) support the sentence in question."  United States v. Gonzales, 550 F.3d 1319, 1324 (11th Cir. 2008) (per curiam).  These factors include, among other things, the nature and circumstances of the offense, the history and characteristics of the defendant, the need to reflect the seriousness of the offense, and the applicable guidelines range.  See 18 U.S.C. § 3553(a)(1)–(7).  The district court must impose a sentence sufficient, but not greater than necessary, to comply with these factors.  See id. § 3553(a).  The weight given to any specific § 3553(a) factor is committed to the discretion of the district court.  Gonzales, 550 F.3d at 1324.

The party challenging the sentence must show it is substantively unreasonable.  See United States v. Victor, 719 F.3d 1288, 1291 (11th Cir. 2013).  "A district court abuses its discretion when it (1) fails to afford consideration to

11

relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." United States v. Irey, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc) (quotation omitted). Although not dispositive, "we ordinarily expect [a sentence within the guidelines range] to be reasonable." Victor, 719 F.3d at 1291.

Harris argues that the district court "balanced the sentencing factors before it unreasonably, and therefore arrived at a sentence that does not achieve the purposes of sentencing." Specifically, Harris argues that his sentence is too harsh in light of his severe cognitive limitations. But we cannot say the district court abused its discretion in setting Harris's below-guidelines sentence. The district court specifically addressed several § 3553(a) factors, including Harris's diminished mental functioning. It was within the district court's discretion to give more weight to some § 3553(a) factors, including the severity of the crime and Harris's criminal history. See Gonzales, 550 F.3d at 1324.

**AFFIRMED.**

12