[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 15-14354

————————————————

D.C. Docket No. 1:14-cr-20017-KMW-9

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES DIXON,
MAURIN CHACON,
RODOLFO PORTELA,
CHRISTOPHER ALTAMIRANO,

Defendants-Appellants.

————————————————

Appeal from the United States District Court
for the Southern District of Florida

————————————————

(August 24, 2018)

Before WILLIAM PRYOR, JILL PRYOR, Circuit Judges, and RESTANI,[*] Judge.

WILLIAM PRYOR, Circuit Judge:

_____

[*] Honorable Jane A. Restani, United States Judge for the Court of International Trade, sitting by designation.

These consolidated appeals involve the convictions of four defendants who participated in a drug conspiracy in Little Havana, Miami. Maurin Chacon, Christopher Altamirano, Rodolfo Portela, and James Dixon were members of the self-described "Big Money Team," a gang of drug dealers who also committed robberies and illegally possessed guns as part of their conspiracy. A jury convicted the defendants of conspiracy to distribute 280 grams of cocaine base and several other charges of drug trafficking, firearm possession, armed robbery, and assault. All four defendants argue that the government presented insufficient evidence of a conspiracy. And they raise individual challenges about the sufficiency of the evidence for separate charges, the denial of a motion to suppress evidence, the refusal to give a jury instruction on entrapment, the admission of evidence of uncharged conduct, the prosecutor's closing argument, the failure to conduct a competency hearing, and the reasonableness of their sentences. We affirm.

## I. BACKGROUND

For several years, the "Big Money Team," a gang of drug dealers in Little Havana, Miami, maintained a set of "traps," locations where members of the Team—and only members of the Team or their associates—sold drugs. Individual dealers cooperated to establish a marketplace with a reliable supply of drugs to attract customers to the exclusive territory of the Team. They manned a cluster of locations in close proximity. Some members of the Team also committed robberies

2

to sustain supplies. And some carried guns, especially when they were at the traps at night.

Two cooperating witnesses, Nadim Guzman and Dayaan Zerquera, provided key testimony about the Team. Guzman explained that being a member of the Team meant "[t]hat you [could] sell drugs and make money with them." He testified that members of the Team coordinated to supply drugs to the customers who visited the traps to buy drugs. Guzman explained that "if you had [what a customer wanted] on you, you could sell it." Otherwise, members would "bring[] customers to one another" to satisfy customers' demands and facilitate each other's sales. Some members also pooled their money to buy larger supplies of drugs. And they guarded against competition and disruption by warning nonmembers not to sell drugs near the traps, and by serving as lookouts for each other.

Guzman explained that he sold one to two grams a day of cocaine base, also known as crack cocaine, for 11 months in 2013. He also estimated that three to six members sold drugs at the traps at a time and that each sold about one gram a day. Zerquera testified that he sold two to three grams a day and estimated that the Team as a whole sold three to 18 grams a day, with average sales falling between 16 and 18 grams a day.

Chacon, Altamirano, Portela, and Dixon were all members of the Team. Although the Team had no official "boss" who gave members orders, the Team

3

had an internal hierarchy. Members would "gain respect" or "lose respect" based on perceived contributions, including a reputation for violence and participation in robberies. Chacon and Altamirano were "top guys" who "call[ed] shots." They also participated in robberies and carried guns. Portela also carried guns.

The City of Miami Police Department started to investigate the Team in the summer of 2013. Detective David Bernat of the Gang Intelligence Unit coordinated surveillance of the traps and arranged for purchases of narcotics by a confidential informant. An undercover detective, Kenneth Veloz, also conducted controlled purchases from members of the Team and made video and audio recordings of their interactions.

On November 18, 2013, Officer David Segovia of the Miami-Dade Police Department stopped a car driving on the wrong side of the road. The driver was Portela's girlfriend, and Portela was in the front passenger seat. During the stop, Segovia "smell[ed] . . . marijuana" wafting from the vehicle, and Portela admitted to Segovia that he had a bag of marijuana on his person. Segovia looked inside the car and saw "loose particles" of marijuana on the floorboard. He also observed a gun under the front passenger seat. Another officer then informed him that there was an outstanding warrant for Portela's arrest. Segovia arrested Portela and put him in the police car.

Detective Thomas Wever arrived on the scene approximately two hours later and interviewed Portela. After Wever warned Portela of his rights to remain silent and to counsel, Portela signed a waiver of rights form. He explained that he bought the gun for protection, that it was loaded, and that he had been carrying the gun on his person before the stop, at which point he placed it under the seat.

Meanwhile, Agent Rosniel Perez of the Bureau of Alcohol, Tobacco, Firearms, and Explosives was investigating a separate incident involving Portela's illegal possession of a gun. Although Perez was still "considering whether to open a formal federal investigation," he obtained a search warrant for Portela's DNA shortly after Portela's arrest at the traffic stop. Perez then executed the warrant at the jail where Portela was being held on state charges after having been appointed counsel. When Perez presented the warrant, Portela initiated a conversation and stated that he "wanted to cooperate and make a deal." After Perez warned Portela of his rights and that Perez could not make any deals with him at that time, Portela waived his rights and made incriminating statements.

On November 20, 2013, Altamirano left a trap to go on a "mission" with another member. The duo robbed five people at gunpoint, taking cash and cell phones. As they fled the scene, Altamirano fired a shot from his gun. Altamirano and the other member then returned to the trap, where the robbers "talk[ed] about [the] robbery . . . and show[ed] [other Team members] . . . a phone and a wallet

5

they took." Police officers traced one of the stolen phones to the trap, where they found Chacon, Guzman, other members of the Team, cocaine base, other drugs, and a gun. The officers found Altamirano one block away.

On February 25, 2014, Veloz, the undercover detective, asked Chacon if he had guns for sale during a recorded conversation. Chacon said that he had a "couple" but "need[ed] some more" and mentioned that guns were "expensive right [then]." At a later meeting in Veloz's car, Chacon sold Veloz a revolver that he referred to as "[his] baby."

Also in 2014, Perez obtained search warrants for Team members' social media accounts. He collected posts in which members of the Team identified themselves, boasted about drug sales and violence, brandished weapons, and displayed the Team hand sign.

A federal grand jury indicted Chacon, Altamirano, Portela, Dixon, and several codefendants on one count of conspiracy to possess with intent to distribute 280 grams or more of cocaine base, 21 U.S.C. §§ 841(a), (b)(1)(A)(iii), 846, between 2011 and October 2014. The grand jury also indicted Portela on two counts of possession of a firearm by a convicted felon, 18 U.S.C. § 922(g)(1), one count of possession with intent to distribute marijuana, 21 U.S.C. § 841(a)(1), and one count of possession of a firearm in furtherance of a drug-trafficking crime, 18 U.S.C. § 924(c). The grand jury indicted Altamirano for assault with a dangerous

6

weapon in aid of a racketeering enterprise, *id.* § 1959(a)(3), for possession of a firearm in furtherance of a crime of violence, *id.* § 924(c), and for possession of cocaine base with intent to distribute, 21 U.S.C. § 841(a)(1). The grand jury indicted Chacon for two charges stemming from the same robbery—assault with a dangerous weapon in aid of a racketeering enterprise, 18 U.S.C. § 1959(a)(3), and possession of a firearm in furtherance of a crime of violence, *id.* § 924(c). The grand jury also indicted Chacon for possession with intent to distribute cocaine base, 21 U.S.C. § 841(a)(1), and possession of a firearm in furtherance of a drug-trafficking crime, 18 U.S.C. § 924(c), on the basis of the drugs and the gun that police found when they searched the trap after the November 20 armed robbery. And the grand jury indicted Chacon for possession of a firearm by a convicted felon, *id.* § 922(g)(1).

Before trial, Portela filed a motion to suppress the gun that police found in his girlfriend's car, his statements to Wever after he was arrested, and the statements he later made at the jail. After an evidentiary hearing, the magistrate judge recommended denying the motion. The district court adopted the report and recommendation of the magistrate judge.

The four defendants, as well as a fifth codefendant, went to trial in February 2015. After the parties rested, the district court granted Chacon's motion for a judgment of acquittal of the two charges against him for the November 20 armed

7

robbery. But the government argued in closing that the jury should convict Chacon of one of those charges. The district court then granted Chacon's motion to strike and instructed the jury to disregard the references to the acquitted counts. Chacon moved for a mistrial, but the district court denied the motion. The district court also refused Chacon's request for a jury instruction on entrapment as a defense to the count of possession of a firearm by a convicted felon. 18 U.S.C. § 922(g)(1). The jury convicted the four defendants on the counts involved in this appeal, but it acquitted the fifth codefendant.

The district court sentenced Chacon to 420 months of imprisonment, Altamirano to 235 months of imprisonment, and Dixon to 144 months of imprisonment. It sentenced Portela, who was facing a mandatory life sentence, to a term of 360 months after he negotiated a deal with the government not to appeal his sentence. At the sentencing hearing, Portela introduced some evidence that he had diminished mental capacity, but the district court found that he had knowingly and voluntarily waived his right to appeal.

## II. DISCUSSION

We divide our discussion in several parts. First, we explain that sufficient evidence supports each defendant's conviction for the drug conspiracy. Next, we explain that the district court correctly denied Portela's motion to suppress evidence, that sufficient evidence supports his conviction for possession of a

8

firearm in furtherance of a drug-trafficking crime, that he was not entitled to a competency hearing, and that he waived his right to appeal his sentence. We then explain that sufficient evidence supports Altamirano's conviction for a violent crime in aid of racketeering. We next explain that sufficient evidence supports Chacon's convictions for possession of a firearm and for possession of narcotics and that the district court did not err when it admitted evidence of his uncharged conduct, when it refused to instruct the jury on entrapment, or when it denied his motion for a mistrial. We also explain that Chacon's sentence is procedurally and substantively reasonable. Finally, we explain that the remaining issues raised by the defendants are meritless.

### A.    *Sufficient Evidence Supports Each Conviction for Conspiracy to Distribute 280 Grams of Cocaine Base*

Chacon, Altamirano, Portela, and Dixon challenge the sufficiency of the evidence for their convictions for conspiracy to possess with intent to distribute 280 grams or more of cocaine base, 21 U.S.C. §§ 841(a), (b)(1)(A)(iii), 846, on several grounds. They argue that the government failed to prove the existence of a single conspiracy to sell drugs. And each defendant contends that insufficient evidence establishes that he joined that conspiracy. They also attack the sufficiency of the evidence about the quantity of drugs they conspired to distribute. "We review *de novo* the sufficiency of evidence." *United States v. Duperval*, 777 F.3d 1324, 1331 (11th Cir. 2015). But we must "view the evidence in the light most

9

favorable to the government and draw all reasonable inferences and credibility choices in favor of the jury's verdict." *Id.* (alterations adopted) (quoting *United States v. Demarest*, 570 F.3d 1232, 1239 (11th Cir. 2009)).

To establish a conspiracy, the government must prove that "a conspiracy (or agreement) existed," that the defendants "knew the essential [unlawful] objects of the conspiracy," and that the defendants "knowingly and voluntarily participated." *United States v. Green*, 818 F.3d 1258, 1274 (11th Cir. 2016) (quoting *United States v. Westry*, 524 F.3d 1198, 1212 (11th Cir. 2008)). And when the government attempts to prove that defendants were part of a single overarching conspiracy and not multiple smaller conspiracies, it may rely on evidence such as "whether a common goal existed [among the conspirators]," "the nature of the underlying scheme," and "the overlap of participants." *United States v. Richardson*, 532 F.3d 1279, 1284 (11th Cir. 2008) (quoting *United States v. Moore*, 525 F.3d 1033, 1042 (11th Cir. 2008)). "It is important to note that 'separate transactions are not necessarily separate conspiracies, so long as the conspirators act in concert to further a common goal. If a defendant's actions facilitated the endeavors of other co-conspirators, or facilitated the venture as a whole, a single conspiracy is established.'" *Id.* (alteration adopted) (emphases omitted) (quoting *Moore*, 525 F.3d at 1042).

10

The government presented ample evidence of a single conspiracy to sell drugs by members of the self-described "Big Money Team." It offered evidence of a common goal when Guzman testified that membership in the Team meant "[t]hat you [could] sell drugs and make money with them." It also introduced evidence that the Team maintained a set of "traps" where members of the Team—and only members or associates of the Team—sold drugs, shared customers, kept lookout for one another, and cooperated to supply the drugs that consumers demanded. For example, Guzman explained that "customer[s] would come" to the traps to buy narcotics, "and if you had [the drugs] on you, you could sell [them]." Otherwise, Team members would "bring[] customers to one another." He also testified that Team members would "split money" from certain drug sales. And Veloz testified about "an undercover drug [deal]" with Dixon and another member of the Team, whom Dixon asked to sell Veloz the "additional crack rock" needed to complete the deal. As we concluded in a similar case that also involved a common sales area and the sharing of customers and money, "[f]rom this evidence the jury was free to infer that [members of the Team] had a common goal: to deal in cocaine [base] and to provide a marketplace for cocaine [base], and an overlap of participants." *United States v. Brown*, 587 F.3d 1082, 1090 (11th Cir. 2009). Indeed, we have explained that such a "'marketplace' is at the heart of [a] conspiracy because those seeking cocaine [will] be drawn to a location and not to a particular dealer." *Id.* The

11

evidence established that members of the Team "facilitated the endeavors of other co-conspirators" and "the venture as a whole." *Richardson*, 532 F.3d at 1284 (emphasis omitted) (quoting *Moore*, 525 F.3d at 1042).

The defendants respond that the evidence instead establishes "several different conspiracies to buy and sell illegal drugs and to commit robberies" that involved only some of the defendants. They assert that individual dealers operated independent drug businesses at the traps. They stress that "[e]veryone bought for themselves and sold for themselves" and that "[t]here was no boss" who gave them "orders" about their drug sales. And they cite Zerquera's testimony that no one assigned Team members specific shifts at the traps and that "everybody would be selling at their own risk."

These arguments assume that a unified conspiracy requires a command-and-control structure, with one or more "boss" conspirators coordinating the actions of each player. But our precedents hold otherwise. We explained in *Westry* that "[individual] drug dealers" who collaborate "to achieve the overall results of their several efforts" can be conspirators—even if they "sometimes, or even always, compete for supplies or customers." *Westry*, 524 F.3d at 1213 (quoting *United States v. Johnson*, 54 F.3d 1150, 1154–55 (4th Cir. 1995)). Although the dealers in *Westry* sold drugs at separate locations and engaged in "healthy competition" with one another, we held that the "interrelatedness" of their operations and the manner

12

in which "their combined efforts produced a haven for the illegal distribution of drugs" established a conspiracy. *Id.* The same is true in this appeal. Members of the Team "act[ed] in concert to further a common goal," *Richardson*, 532 F.3d at 1284 (emphasis omitted) (quoting *Moore*, 525 F.3d at 1042), by "engaging in a consistent series of smaller transactions that furthered [the Team's] ultimate object of supplying the consumer demand of the market," *Westry*, 524 F.3d at 1213 (citation and internal quotation marks omitted). And even if the government did need to establish that the conspiracy had an internal control structure, the evidence suggests at least an unofficial hierarchy. Guzman testified that Chacon and Altamirano were "top guys" who "call[ed] shots"; indeed, they would "[t]ell people how to do [things], how to sell, where to go, who[m] to talk to, [and] who[m] not to talk to."

The defendants' individual arguments that the government failed to prove that they were members of the larger conspiracy are also unavailing. "Once the existence of a conspiracy is established, only slight evidence is necessary to connect a particular defendant to the conspiracy." *United States v. Garcia*, 405 F.3d 1260, 1270 (11th Cir. 2005) (quoting *United States v. Clavis*, 956 F.2d 1079, 1085 (11th Cir. 1992)). The cooperators identified all four defendants as Team members who sold drugs at the traps. Indeed, Guzman testified that he had served as a lookout for each of them.

13

The government also presented substantial corroborating evidence that the defendants "knowingly and voluntarily participated" in a single conspiracy. *Green*, 818 F.3d at 1274 (quoting *Westry*, 524 F.3d at 1212). Guzman distinguished between "an official member" of the Team and a mere "associate," and the defendants were members. Chacon boasted about the Team, saying "BMT we run the block" and "the block, we took it over." Altamirano forbade nonmembers from selling at the traps and warned Chacon about threats to the Team from possible informants or cooperators. These "efforts to conceal a conspiracy may support the inference that [Chacon] knew of the conspiracy and joined it." *United States v. Reeves*, 742 F.3d 487, 500 (11th Cir. 2014). Portela also attempted to "conceal [the] conspiracy," *id.*, when, after his arrest, he warned Chacon and "[the] boys" to "clear" out drugs. Although Dixon asserts that he never sold drugs "with anyone else," the testimony of a detective that he "participate[d] in an undercover drug transaction with . . . Dixon" contradicts his assertion. And Dixon displayed the Team hand sign in a picture with other members that was posted on social media.

The defendants respond that "mere presence at the scene of a crime is insufficient to support a conspiracy conviction" by itself, *United States v. McDowell*, 250 F.3d 1354, 1365 (11th Cir. 2001), but this argument misses the mark. The government did not rely only on evidence that the defendants were discovered at the scene of drug trafficking. It instead presented testimony that each

14

defendant in fact sold drugs, and it connected these sales through Guzman's testimony that he served as a lookout for each defendant. In any event, we have explained that "repeated presence" at trafficking sites is "material and probative" evidence "that the jury may consider." *United States v. Calderon*, 127 F.3d 1314, 1326 (11th Cir. 1997) (citation and internal quotation marks omitted). Indeed, evidence that a defendant participated in just two drug transactions can establish that he joined the conspiracy. *See United States v. Lyons*, 53 F.3d 1198, 1202–03 (11th Cir. 1995). And the government presented evidence that the defendant with the briefest tenure on the Team, Dixon, sold drugs at the traps "[m]ore than a dozen" times. The evidence of frequent, coordinated drug sales rebuts each defendant's argument that he merely "decided to sell drugs by himself, for his own account, in front of the same areas where some of the people he knew were also selling."

The defendants also attack the veracity of the cooperators' testimony about the quantity of drugs that they conspired to distribute, but this challenge fails because "the jury has exclusive province over [witness credibility] and we may not revisit the question." *Green*, 818 F.3d at 1274 (quoting *United States v. Hernandez*, 743 F.3d 812, 814 (11th Cir. 2014)). Indeed, "[w]e will not disturb the jury's verdict 'unless the testimony is incredible as a matter of law.'" *Id.* (quoting *United States v. Flores*, 572 F.3d 1254, 1263 (11th Cir. 2009)). And "[f]or testimony of a

15

government witness to be incredible as a matter of law, it must be unbelievable on its face. It must be testimony as to facts that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature." *Calderon*, 127 F.3d at 1325 (alteration adopted) (citations and internal quotation marks omitted). The defendants provide no reason to conclude that the cooperating conspirators could not have possibly observed the operations of the conspiracy and the quantity of drugs sold by its members. The jury was entitled to credit their testimony.

B.     *The District Court Correctly Denied Portela's Motion to Suppress*

Portela argues that the district court should have suppressed both the gun found in his girlfriend's car and his post-arrest statements because the search of the car violated his rights under the Fourth Amendment. He also contends that the district court should have suppressed statements he later made while in jail because of a violation of his Sixth Amendment right to counsel. A mixed standard of review applies to the denial of a motion to suppress. *See United States v. Barber*, 777 F.3d 1303, 1304 (11th Cir. 2015). "We review the district court's findings of fact for clear error and its legal conclusions *de novo*. All facts are construed in the light most favorable to the party prevailing below." *United States v. Johnson*, 777 F.3d 1270, 1274 (11th Cir. 2015) (quoting *United States v. Virden*, 488 F.3d 1317, 1321 (11th Cir. 2007)).

16

1.    Portela's Challenge to the Search of his Girlfriend's Car Fails

Portela's challenge to the warrantless search of the car fails for two independent reasons. First, he lacks standing to challenge the search because he lacked a reasonable expectation of privacy in the car. Second, the officers were entitled to search the car.

The Fourth Amendment prohibits "unreasonable searches and seizures," U.S. Const. Amend. IV, and this prohibition extends to cars, *see Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018). But not every occupant has standing to challenge a flawed search. Instead, "[a] defendant has standing to challenge a . . . search if the defendant had a 'legitimate expectation of privacy' in the property when it was searched." *United States v. Gibson*, 708 F.3d 1256, 1276 (11th Cir. 2013) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). An expectation of privacy is reasonable if "it 'has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *Id*. (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)). "We have held that a 'passenger in a private car, who has no possessory interest in the automobile, does not have a legitimate expectation of privacy in the interior of the automobile because he does not have the right to exclude others from the car.'" *United States v. Lee*, 586 F.3d 859, 864 (11th Cir.

17

2009) (alterations adopted) (quoting *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008)).

Portela argues that the district court erred when it concluded that he lacked standing to challenge the search of the car. Although Portela admits that he was only a passenger in a car that he did not own, he nonetheless asserts that he had a reasonable expectation of privacy because "he had a possessory interest in the vehicle."

Portela lacked a possessory interest in the vehicle. The term "possessory interest" means "[t]he present right to control property, including the right to exclude others, by a person who is not necessarily the owner"; or "[a] present or future right to the exclusive use and possession of property." *Possessory interest*, Black's Law Dictionary (10th ed. 2014); *see also Byrd*, 138 S. Ct. at 1527 ("One of the main rights attaching to property is the right to exclude others, and, in the main, one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude." (citation and internal quotation marks omitted)). Portela falls short of this definition because he had no legal interest in the vehicle and, at the time of the search, was a passenger with no power to control the vehicle or exclude others from it. *See Lee*, 586 F.3d at 864. To be sure, Portela maintains that he had "permission to use [the car] any time he wanted" and that he had the spare key to the car. He also asserts that he "le[ft]

18

personal belongings in the car," paid to repair the car, and sometimes purchased gas. But these connections to the car hardly establish an interest that is grounded in "property law or . . . recognized and permitted by society." *Byrd*, 138 S. Ct. at 1527 (citation and internal quotation marks omitted). Portela did not have "exclusive custody and control" of the car, *Gibson*, 708 F.3d at 1278, when the legal owner was driving it and he was a mere passenger. That he may have used the car on other occasions, even frequently, does not give him a durable interest in the car equivalent to that of the legal owner and driver.

In any case, other evidence suggests that Portela overstates his connections to the car. For example, Portela "did not have a driver's license," and his girlfriend "permitted him to drive her car by himself" only the "short distance from his residence to the corner store." And Portela "never used" the spare key. Because Portela lacked a personal Fourth Amendment interest in the car, his challenge to the search of the car and its fruits fails.

In any event, the officers were entitled to search the car without a warrant under the automobile exception. "[T]he automobile exception permits warrantless vehicle searches if the vehicle is operational and agents have probable cause to believe the vehicle contains evidence of a crime." *United States v. Tamari*, 454 F.3d 1259, 1264 (11th Cir. 2006); *accord United States v. Lanzon*, 639 F.3d 1293, 1299–300 (11th Cir. 2011). "Probable cause exists when there is a fair probability

19

that contraband or evidence of a crime will be found in the vehicle under the totality of the circumstances." *Lanzon*, 639 F.3d at 1300. We have explained that an officer's credible testimony that he smelled marijuana can establish probable cause. *See United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) (en banc).

The automobile exception applies to the search of Portela's girlfriend's car. There is no doubt that "the vehicle [was] operational," *Tamari*, 454 F.3d at 1264, because she was driving it—albeit on the wrong side of the road—before the stop. And the officers had probable cause to search the car. Segovia testified that he "smelled the odor of marijuana" when he approached the passenger side of the car and that he "saw small buds of marijuana on the floorboard," and the district court did not clearly err when it credited this testimony. Although Portela contended that it was "impossible" that Segovia smelled marijuana, the magistrate judge, who saw and heard the witnesses testify, found that "Portela was not credible whe[n he] contradicted the testimony of [the officers]." Portela also stresses that Wever did not notice the smell of marijuana. But the magistrate judge explained that Wever's testimony did not conflict with Segovia's because Wever did not arrive until at least two hours after Segovia stopped the car. The district court was entitled to deny Portela's motion to suppress the gun and his later inculpatory statements.

20

2.    The Interview at the Jail Did Not Violate Portela's Right to Counsel

The Sixth Amendment entitles criminal defendants to counsel, *United States v. Burgest*, 519 F.3d 1307, 1309–10 (11th Cir. 2008), and this right "attach[es] [when] a prosecution is commenced . . . [by] the initiation of adversary judicial criminal proceedings," *id.* at 1310 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)). Once the right attaches, the government may not "initiate interrogation" of the defendant. *Id.* (quoting *Michigan v. Jackson*, 475 U.S. 625, 636 (1986)). But this right "is offense specific" and ordinarily binds only the sovereign that has charged the defendant. *Id.* In other words, a defendant's "invocation of his right to counsel for [a] charged state offense d[oes] not attach to [an] uncharged federal . . . offense[] if the federal offense[] [is a] separate offense[] from the state . . . offense." *Id.* "[W]here conduct violates laws of separate sovereigns, the offenses are distinct . . . ." *Id.*

Portela contends that the district court should have suppressed statements he made to Perez and Bernat while in jail after his arrest on state charges, but this argument fails. Portela highlights that he had been appointed counsel for the state offense, and he contends that the state charges concerned the same case as the federal investigation. But these contentions are irrelevant. The Sixth Amendment bars only the "*police* [from] initiat[ing] interrogation after a defendant's assertion [of his right to counsel]." *Id.* (emphasis added) (citation and internal quotation

21

marks omitted). Here, the magistrate judge found that *Portela* "initiated the conversation with Agent Perez concerning the federal investigation," and Portela has not challenged this finding, much less established that it is clearly erroneous. And Portela acknowledged in the district court that if he "initiated the conversation regarding the federal investigation, . . . there was no violation of his right to counsel based on the prior invocation of his rights." Because Portela initiated the conversation, his Sixth Amendment challenge fails.

C.    *Sufficient Evidence Supports Portela's Conviction for Possession of a Firearm in Furtherance of a Drug-Trafficking Crime*

Portela argues that the government failed to present sufficient evidence that he possessed the gun found in his girlfriend's car in furtherance of a drug-trafficking crime. He maintains that the "half a gram of marijuana [discovered during the search] is insufficient evidence of . . . drug trafficking" and that "no other evidence . . . [suggests] that a drug trafficking crime was being engaged in." He also argues that, even if he were engaged in drug trafficking, "the firearm and ammunition found underneath the seat" lacked a "nexus" to the offense.

Federal law forbids the possession of a firearm "in furtherance of [a drug-trafficking crime]." 18 U.S.C. § 924(c)(1)(A). We have explained that the "in furtherance" requirement demands that the government "establish that 'the firearm helped, furthered, promoted, or advanced the drug trafficking.'" *United States v. Mercer*, 541 F.3d 1070, 1076 (11th Cir. 2008) (quoting *United States v. Timmons*,

22

283 F.3d 1246, 1252 (11th Cir. 2002)). In other words, the government must "show[] . . . some nexus between the firearm and the drug selling operation." *Id.* (quoting *Timmons*, 283 F.3d at 1253). Evidence of a nexus may include "the kind of drug activity . . . being conducted, accessibility of the firearm, the type of firearm, whether the firearm is stolen, the status of the possession (legitimate or illegal), whether the firearm is loaded, proximity of the firearm to the drugs or drug profits, and the time and circumstances under which the firearm is found." *Id.* at 1076–77. We review the sufficiency of the evidence *de novo*. *Id.* at 1074.

The jury was entitled to find that Portela was engaged in drug trafficking and that the firearm had a nexus to the offense. The government introduced a conversation between Portela and another person on the day of the stop in which that person requested marijuana from Portela. And it introduced a recording in which Portela explained that he told his girlfriend to get the car that night because "[he] was trying to go do something and get some money . . . ." Based on these interactions and the marijuana found in the car, a reasonable jury could infer that Portela was on his way to sell drugs when the police stopped the car. And sufficient evidence connected the gun to this offense. The jury heard testimony from the officers that the firearm was in "proximity" to the drugs found in the car, *id.* at 1077, that the firearm found under the seat was "accessib[le]" to Portela, *id.* at 1076, that "the firearm [was] loaded," *id.* at 1077, and that Portela "illegal[ly]"

23

possessed the gun, *id.* Indeed, Portela admitted to the officers that he had marijuana on his person and had the gun on his person before the traffic stop.

### D.    *Portela's Arguments About His Competency and Sentence Fail*

Portela makes two arguments related to his "traumatic brain injury and mental deficits." He contends that the district court violated his procedural due process rights by not "*sua sponte* conduct[ing] a competency hearing to determine if [he] was competent to plead guilty and fully underst[oo]d the legal ramifications of his actions." And he argues that his impairments render invalid the waiver of his right to appeal his sentence. We reject both arguments.

### 1.    The District Court Did Not Abuse Its Discretion when It Failed to Order a Competency Hearing *Sua Sponte*

"Due process requires that a defendant not be made to stand trial for a criminal charge unless he is mentally competent." *Fallada v. Dugger*, 819 F.2d 1564, 1568 (11th Cir. 1987). In other words, he must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and . . . a rational as well as factual understanding of the proceedings against him." *United States v. Cruz*, 805 F.2d 1464, 1479 (11th Cir. 1986) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)). If the district court has "reasonable cause to believe that the defendant [is not competent]," it must *sua sponte* order a competency hearing. 18 U.S.C. § 4241(a); *see also United States v. Wingo*, 789 F.3d 1226, 1235–36 (11th Cir. 2015). In deciding whether to

24

order a hearing, the district court should consider "evidence of the defendant's irrational behavior," his "demeanor at trial," and "prior medical opinion regarding the defendant's competence." *Wingo*, 789 F.3d at 1236 (quoting *Tiller v. Esposito*, 911 F.2d 575, 576 (11th Cir. 1990)). "We review for abuse of discretion a district court's failure to *sua sponte* order a hearing on the defendant's competency under [s]ection 4241." *Id.*

Portela contends that the district court should have ordered a competency hearing. He highlights that he informed the district court of a "neuro-psychological evaluation" that found that he had an IQ of 78, his "history of traumatic head injuries," and his "impaired" "higher executive function" and "impulse control." On appeal he also cites for the first time a medical report that shows a history of mental issues.

The district court did not abuse its discretion when it declined to order a hearing. Although Portela presented evidence of mental problems, the district court also possessed evidence that Portela was both competent and feigning illness to avoid responsibility. For example, during recorded prison calls Portela instructed an associate to "tell hi[s lawyer] that . . . [Portela is] kind of crazy" and stated that he was "trying to" be "sen[t] . . . to a crazy hospital." He also told his doctor to prescribe him medication because he "[had] to work [his] magic on this [case]." We have explained that evidence that a defendant's "behavior was the product of a

25

competent, calculating mind" is grounds to deny a competency hearing. *United States v. Perkins*, 787 F.3d 1329, 1340 (11th Cir. 2015); *see also Hance v. Zant*, 696 F.2d 940, 948 (11th Cir. 1983) (affirming the denial of a competency hearing when evidence "could . . . easily be interpreted to be evidence [of] . . . a rational, albeit immature, plan of deception"), *overruled on other grounds by Brooks v. Kemp*, 762 F.2d 1383 (11th Cir. 1985) (en banc). The district court also had the advantage of assessing this evidence in combination with its firsthand observations of Portela's "demeanor at trial." *Wingo*, 789 F.3d at 1236 (quoting *Tiller*, 911 F.2d at 576). We see no abuse of discretion.

2.      Portela Waived His Right to Appeal His Sentence

Portela attempts to appeal his sentence despite an agreement in which the government agreed to recommend a sentence of 360 months of imprisonment if Portela waived his right to appeal. He contends that, although the district court questioned him about the waiver at the plea hearing, his "cognitive deficits" prevented him from "mak[ing] a cogent decision." He concludes that "the record does not reflect a knowing and voluntary relinquishment of [his] right to appeal."

A defendant's waiver of his right to appeal his sentence "is valid if [he] enters into it knowingly and voluntarily." *United States v. Bascomb*, 451 F.3d 1292, 1294 (11th Cir. 2006). We have explained that a waiver is knowing and voluntary if "either: (1) the district court specifically questioned the defendant

26

about the waiver during the plea colloquy, or (2) the record clearly shows that the defendant otherwise understood the full significance of the waiver." *United States v. Grinard-Henry*, 399 F.3d 1294, 1296 (11th Cir. 2005) (emphasis omitted) (quoting *United States v. Benitez-Zapata*, 131 F.3d 1444, 1446 (11th Cir. 1997)).

Portela's waiver was valid. "[T]he district court specifically questioned [Portela] about the waiver during the plea colloquy," *id.*, when it asked if he "underst[oo]d" that he "[would] not appeal [his] sentence to a [h]igher [c]ourt." Portela unambiguously responded, "Yes, I do, Your Honor." The district court also specifically found "that the waiver was knowing and voluntary." And Portela cannot rely on his mental issues to avoid responsibility for his answer in the light of the evidence that he was competent and attempted to exaggerate his impairments.

## E.    *Sufficient Evidence Supports Altamirano's Conviction for a Violent Crime in Aid of Racketeering*

Federal law punishes anyone who, "for the purpose of . . . maintaining or increasing [his] position in an enterprise engaged in racketeering activity, . . . [commits] assault[] with a dangerous weapon." 18 U.S.C. § 1959(a). The government can establish the motive element with evidence "that [the defendant] committed [the violent crime] because he knew it was expected of him by reason of his membership in [the gang] or that he committed [the violent crime] in furtherance of that membership." *United States v. Robertson*, 736 F.3d 1317, 1330

27

(11th Cir. 2013) (citation and internal quotation marks omitted). For example, evidence that "violence was a part of the group's culture," "that the group expected its members to . . . engag[e] in violent acts," or that the defendant reported his actions to prove himself or "to brag," *id.*, supports the inference that the defendant "was motivated" by his membership, *id.* at 1331. We review the sufficiency of the evidence *de novo*. *Mercer*, 541 F.3d at 1074.

Altamirano argues that the government failed to prove that he acted with the requisite motive of "maintaining or increasing [his] position in [the] enterprise," 18 U.S.C. § 1959(a), but we disagree. Zerquera explained that some members of the Team "had more . . . authority than others" within the gang and that the members who "carrie[d] the most respect" had reputations for violence. Guzman also testified that "the money for the drugs" came "[f]rom robberies" and that a member would "lose respect" if he refused to help with a robbery. He also explained that Altamirano was "one of the top guys." This close connection between violence, participation in robberies, and status entitled the jury to conclude that Altamirano "committed [robberies] because he knew it was expected of him by reason of his membership in [the Team]." *Robertson*, 736 F.3d at 1330 (quoting *United States v. Whitten*, 610 F.3d 168, 178 (2d Cir. 2010)); *see also id.* at 1331. Indeed, after the November 20, 2013, armed robbery, Altamirano and the other robber returned to other Team members at the trap, where they "talk[ed] about [the] robbery" and

28

"show[ed] [off] . . . a phone and a wallet they took." This evidence of boasting also supported the jury's verdict. For these reasons, we reject Altamirano's challenge to his conviction under section 1959(a).

F.     *Sufficient Evidence Supports Chacon's Convictions for Possession with Intent to Distribute Cocaine Base and for Possession of a Firearm in Furtherance of a Drug-Trafficking Crime*

Chacon challenges the sufficiency of the evidence for his convictions for possession with intent to distribute cocaine base, 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii), and possession of a firearm in furtherance of a drug-trafficking crime, 18 U.S.C. § 924(c)(1)(A), that stem from the drugs and gun that the police found at the trap after the armed robbery. He contends that because no evidence suggests he joined a conspiracy concerning these offenses, the district court erred when it gave an instruction that allowed the jury to convict him based on his role in the conspiracy under the doctrine established in *Pinkerton v. United States*, 328 U.S. 640 (1946). Chacon argues that although he was present at the trap when the police searched it after the armed robbery, no evidence "proved that [he] was []aware of the . . . drugs" or "of the gun." And he confusingly contends that the jury could not have convicted him for possessing the gun in furtherance of a drug-trafficking offense because the gun was the same weapon used in the robbery and the district court dismissed the charges against Chacon related to the robbery.

29

Under *Pinkerton*, a "member of a conspiracy . . . is criminally liable" for the "reasonably foreseeable crimes" that other conspirators commit "during the course of and in furtherance of the conspiracy." *United States v. Moran*, 778 F.3d 942, 961 (11th Cir. 2015). To establish that the defendant was part of a conspiracy, "the [g]overnment must prove that a conspiracy existed, that the defendant had knowledge of the essential aims of the conspiracy, and that with such knowledge, the defendant joined the conspiracy." *United States v. Newton*, 44 F.3d 913, 921 (11th Cir. 1995). Once it does so, the defendant may be liable for substantive offenses committed by fellow conspirators even if he "lack[ed] . . . knowledge thereof," *United States v. Silvestri*, 409 F.3d 1311, 1335 (11th Cir. 2005) (emphasis omitted) (quoting *United States v. Mothersill*, 87 F.3d 1214, 1218 (11th Cir. 1996)). "[A] district court does not err in giving a *Pinkerton* instruction if 'the evidence was sufficient for a reasonable jury to have concluded, beyond a reasonable doubt, that the [crimes] were reasonably foreseeable consequences of the conspiracy.'" *United States v. Shabazz*, 887 F.3d 1204, 1219 (11th Cir. 2018) (alterations adopted) (quoting *United States v. Alvarez*, 755 F.2d 830, 848 (11th Cir. 1985)). We review the sufficiency of the evidence *de novo*. *Mercer*, 541 F.3d at 1074.

The district court was entitled to give a *Pinkerton* instruction, and the jury was entitled to find Chacon guilty for the drug and firearm offenses based on his

30

role in the conspiracy. As explained above, ample evidence establishes that Chacon was part of the conspiracy. For example, Guzman testified that Chacon "was one of the top guys" in the Team. The possession of cocaine base at one of the traps from which the Team sold drugs naturally was a "reasonably foreseeable crime[]" "during the course of and in furtherance of the conspiracy." *Moran*, 778 F.3d at 961. The possession of the gun also was reasonably foreseeable and occurred during the course of and in furtherance of the conspiracy in the light of Guzman's testimony that the Team looked favorably on violence, that "the money for the drugs" came "[f]rom robberies," and that Chacon, Altamirano, and Portela carried guns when they sold out of the traps at night. This evidence about the connection between drugs, violence, and robberies also establishes that the gun had the necessary "nexus," *Mercer*, 541 F.3d at 1076 (quoting *Timmons*, 283 F.3d at 1253), to a drug-trafficking crime under section 924(c)(1)(A). And Chacon's argument that the dismissal of the robbery charges absolves him of responsibility for the gun fails because the prohibition in section 924(c) on possessing a gun in furtherance of drug trafficking defines a freestanding criminal offense that does not depend on any other charges or convictions.

## G.    *The District Court Did Not Err when It Admitted Evidence of Chacon's Uncharged Conduct*

Chacon contends that the district court abused its discretion when it admitted certain evidence about his conduct that was not charged in the conspiracy. This

31

evidence includes a video of Chacon robbing an elderly man in 2014, a police officer's testimony that he twice seized marijuana from Chacon, a neighbor's testimony that he witnessed Chacon commit robberies and fire a gun in front of the traps, and testimony about a fight that started when Chacon robbed the witness's girlfriend.

Federal Rule of Evidence 404 provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But this Rule does not apply to "evidence of uncharged offenses that are intrinsic to the charged conduct." *United States v. Holt*, 777 F.3d 1234, 1262 (11th Cir. 2015). Evidence is intrinsic if "arose out of the same transaction or series of transactions as the charged offense," "is necessary to complete the story of the crime," or "is inextricably intertwined with the evidence regarding the charged offense." *Id.* (quoting *United States v. McLean*, 138 F.3d 1398, 1403 (11th Cir. 1998)). Intrinsic evidence is still subject to Rule 403, *see United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007), which provides that a district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice," Fed. R. Evid. 403. We review evidentiary rulings for abuse of discretion. *See Gibson*, 708 F.3d at 1275.

32

The government offers several procedural responses to Chacon's arguments, but we need not address them because Chacon's arguments fail on the merits. The video of the robbery and the testimony about robberies and the gun were intrinsic because they were "linked in time and circumstances with the charged [conspiracy]," *Holt*, 777 F.3d at 1262 (quoting *McLean*, 138 F.3d at 1403). More specifically, the government described a conspiracy in which "the money for the drugs" came "[f]rom robberies" and the status of members was tied to robberies and violence, so it was entitled to offer examples of such robberies to the jury. Chacon's objection to the testimony about the fight likewise fails because this fight was prompted by "a robbery [of the witness's] girlfriend." Chacon's marijuana possession was also intrinsic because it naturally was "linked in time and circumstances" with a conspiracy centered on drug trafficking. *Id.* (quoting *McLean*, 138 F.3d at 1403). For example, Guzman testified that the conspiracy involved sales of marijuana and that he sold marijuana to Chacon, so this evidence helped establish Chacon's association with the Team.

The intrinsic evidence also satisfied Rule 403. Its probative value in illustrating the nature of the conspiracy and the operations of the Team was not substantially outweighed by the risk of unfair prejudice. Indeed, "Rule 403 is an extraordinary remedy that must be used sparingly because it results in the exclusion of concededly probative evidence," *United States v. U.S. Infrastructure,*

33

*Inc.*, 576 F.3d 1195, 1211 (11th Cir. 2009), and "the balance 'should be struck in favor of admissibility.'" *Edouard*, 485 F.3d at 1344 n.8 (quoting *United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006)). The district court did not abuse its discretion when it admitted evidence of Chacon's uncharged conduct.

### H.     The District Court Correctly Denied Chacon's Motion for a Mistrial Based on Prosecutorial Misconduct During Closing Arguments

Chacon complains about references in the prosecution's closing argument to charges against him that the district court had dismissed. He underscores that the government asserted that Chacon should have foreseen Altamirano's robbery and the use of the gun in the robbery and that the government showed the jury a slideshow that listed these charges. Chacon contends that these references prejudiced his substantial rights because they "put before the jury speculation that he was tied []to these counts" and "conveyed to the jury [that he] was guilty" of them. He also argues that the district court's instruction that the jury "disregard any reference" to the charges and the government's concession to the jury that it had erred were insufficient to cure the mistake.

The government commits misconduct at trial when it makes "improper" remarks that "prejudicially affect the substantial rights of the defendant." *Reeves*, 742 F.3d at 505 (quoting *United States v. Gonzalez*, 122 F.3d 1383, 1389 (11th Cir. 1997)). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial

34

would have been different." *Id.* (quoting *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006)). Accordingly, our analysis considers the remarks "in the context of the trial as a whole" and examines whether the comments "had a tendency to mislead the jury or prejudice the defendant," "whether the comments were isolated or extensive," whether the government intentionally made the comments, and the "strength of the [evidence]." *Id.* Importantly, "[b]ecause statements and arguments of counsel are not evidence, improper statements can be rectified by the district court's instruction to the jury that only the evidence in the case be considered." *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009) (quoting *United States v. Smith*, 918 F.2d 1551, 1562 (11th Cir. 1990)). "Even if [the] comments [are] inappropriate, reversal is only warranted if the entire trial is so replete with errors that [the defendant] was denied a fair trial." *Eckhardt*, 466 F.3d at 947. We review this issue "*de novo* because it is a mixed question of law and fact." *Id.*

No error occurred, and Chacon is not entitled to a new trial. Although the prosecutor misspoke, this mistake did not amount to misconduct because it did not "prejudicially affect [Chacon's] substantial rights." *Reeves*, 742 F.3d at 505 (quoting *Gonzalez*, 122 F.3d at 1389). The references to the dismissed charges were not "extensive," nothing suggests that the prosecutor acted "deliberately," extensive evidence "establish[ed] the guilt of [Chacon]," and the prosecutor's

35

quick admission of error reduced the possibility that the jury was "misle[d]." *Id.* The district court also took an adequate "curative measure" when it promptly instructed the jury to disregard all references to the acquitted counts, *see Lopez*, 590 F.3d at 1256, and "we must presume that [the] jur[y] follow[ed this] instruction[]," *United States v. Zitron*, 810 F.3d 1253, 1258 (11th Cir. 2016) (quoting *Johnson v. Breeden*, 280 F.3d 1308, 1319 (11th Cir. 2002)). The district court committed no error when it denied Chacon's motion for a mistrial.

## I.    *The District Court Did Not Err when It Refused to Instruct the Jury on Entrapment*

Chacon argues that the district court erred when it refused his request for an entrapment instruction. "The entrapment defense involves two separate elements: (1) [g]overnment inducement of the crime, and (2) lack of predisposition on the part of the defendant." *United States v. Isnadin*, 742 F.3d 1278, 1297 (11th Cir. 2014) (emphasis omitted). "The defendant bears an initial burden of production to show . . . [g]overnment inducement." *Id.* (emphasis omitted). He can satisfy this burden by "produc[ing] any evidence sufficient to raise a jury issue 'that the [g]overnment's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it.'" *Id.* (quoting *United States v. Andrews*, 765 F.2d 1491, 1499 (11th Cir. 1985)). If the defendant does satisfy this burden, "the burden shifts to the [g]overnment to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime." *Id.* A

36

defendant who asserts the affirmative defense of entrapment "is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment." *Mathews v. United States*, 485 U.S. 58, 62 (1988).

We review the refusal of a district court to grant an entrapment instruction *de novo*, although we acknowledge the inconsistency in our precedents that have alternatively "applied a *de novo* standard of review" and "purported to review the question for an abuse of discretion." *United States v. Sistrunk*, 622 F.3d 1328, 1333 (11th Cir. 2010) (collecting cases). The correct standard of review is *de novo*. Whether a defendant is entitled to an entrapment instruction depends on whether "there is *sufficient evidence* from which a reasonable jury could find entrapment," *Mathews*, 485 U.S. at 62 (emphasis added), and the sufficiency of the evidence is a legal question that we review *de novo*, *see Sistrunk*, 622 F.3d at 1332–33 ("We have long held that the sufficiency of the defendant's evidence of government inducement is a legal issue to be decided by the trial court."); *see also, e.g.*, *Calderon*, 127 F.3d at 1329 ("The issue of whether the defense produced sufficient evidence to sustain a particular instruction such as a multiple conspiracy instruction, is generally a question of law subject to *de novo* review." (italics added) (citation and internal quotation marks omitted)); *United States v. Mieres-Borges*, 919 F.2d 652, 656 (11th Cir. 1990) ("Whether there was sufficient

37

evidence to support a conviction is a question of law subject to *de novo* review by this Court." (italics added)). In any event, our precedents that apply the *de novo* standard predate our precedents that review for abuse of discretion. *Compare United States v. Parr*, 716 F.2d 796, 802 (11th Cir. 1983) (reviewing *de novo* and citing decisions by the former Fifth Circuit), *with United States v. Alston*, 895 F.2d 1362, 1368 (11th Cir. 1990) (reviewing for abuse of discretion). And "the earliest panel opinion resolving the issue in question binds this circuit until the [C]ourt resolves the issue en banc." *United States v. Dailey*, 24 F.3d 1323, 1327 (11th Cir. 1994) (quoting *Clark v. Hous. Auth. of Alma*, 971 F.2d 723, 726 n.4 (11th Cir. 1992)).

Chacon argues that he was entitled to have the jury instructed on entrapment in relation to his conviction for possession of a firearm by a felon, 18 U.S.C. § 922(g)(1), but his argument misconceives the charge and evidence against him. Chacon's wished-for entrapment defense rests on an undercover detective's attempts to persuade Chacon to sell him a gun. But Chacon was not prosecuted for *selling* the gun. He was prosecuted for *possessing* the gun, and no "evidence adduced at trial" suggests that the government induced Chacon to possess the gun that he later sold. *United States v. LaFond*, 783 F.3d 1216, 1224 (11th Cir. 2015) (quoting *United States v. Ruiz*, 59 F.3d 1151, 1154 (11th Cir. 1995)). Indeed, his affectionate nickname for the gun—"[his] baby"—suggests that he possessed it

38

before the government entered the picture. That the detective's actions produced the *evidence* of this possession does not make the government responsible for the underlying offense. The district court was right to deny Chacon's requested instruction.

### J.    Chacon's Sentence Is Procedurally and Substantively Reasonable

Chacon challenges his sentence on four grounds. First, he contends that the district court clearly erred when it applied an enhancement for his role as a leader of the drug conspiracy. Second, he contends that the district court clearly erred when it determined that he was liable for at least 2.8 kilograms of cocaine base. Third, he contends that the district court erred when it calculated his criminal history. Fourth, he contends that his sentence is substantively unreasonable. These arguments fail.

"The district court's determination of the defendant's role in the criminal offense is a finding of fact we review for clear error." *United States v. Hill*, 783 F.3d 842, 846 (11th Cir. 2015). We also "review[] for clear error the district court's underlying determination of the drug quantity attributable to a defendant." *United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir. 2012). When a defendant fails to raise an objection to the calculation of his sentence before the district court, we review for plain error. *United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005). And "[w]e review the substantive reasonableness of a

sentence imposed by the district court for abuse of discretion." *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008).

1.    The District Court Did Not Clearly Err when It Applied an Enhancement for Chacon's Role as a Leader of the Drug Conspiracy

The Sentencing Guidelines provide a four-level enhancement "[i]f the defendant was an organizer or leader of [certain] criminal activity." United States Sentencing Guidelines Manual § 3B1.1(a) (Nov. 2014). The commentary explains that "titles such as 'kingpin' or 'boss' are not controlling." *Id.* § 3B1.1 cmt. n.4. Instead, the sentencing judge considers the following factors:

> (1) [the] exercise of decision making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others.

*United States v. Martinez*, 584 F.3d 1022, 1026 (11th Cir. 2009) (quoting *United States v. Gupta*, 463 F.3d 1182, 1198 (11th Cir. 2006)); *accord* U.S.S.G. § 3B1.1 cmt. n.4. But "[t]here is no requirement that all of the considerations have to be present," *Martinez*, 584 F.3d at 1026 (quoting *United States v. Ramirez*, 426 F.3d 1344, 1356 (11th Cir. 2005)), and "[t]here can . . . be more than one person who qualifies as a leader," U.S.S.G. § 3B1.1 cmt. n.4. Indeed, section 3B1.1 requires only "evidence that the defendant exerted some control, influence or decision-

40

making authority over another participant in the criminal activity." *Martinez*, 584 F.3d at 1026.

Chacon argues that the district court clearly erred when it found that he was a leader of the conspiracy. He contends that it erroneously relied on evidence that members described Chacon as a "shot caller" and that he described himself as the boss. Chacon stresses that Guzman and Zerquera testified that "Chacon was not [their] boss" and that he "did not give [them] orders" about drug sales. Chacon also cites testimony that someone else recruited Guzman and that the cooperators "never had to give [Chacon] a cut" of their profits.

The district court did not clearly err. It correctly explained that "being characterized as boss is not controlling" and instead considered specific facts that established Chacon's role as a leader. For example, it highlighted that although "[t]here wasn't any strict hierarchy [in the Team]," "[e]verybody who testified . . . agree[d]" that Chacon was a "shot caller[]" who "inspired or promoted or directed the activities" of the Team. The district court also heard evidence that Chacon "le[d]" the videos that the Team posted on YouTube to boost their "image," that Chacon had declared both that he "r[a]n th[e] block" and that other Team members "[had] to give [him] money," and that a Team member stated that he had to "respect what [Chacon] sa[id]." And Guzman testified that, after he began cooperating with the police, Chacon called him and accused him of "snitching" and

41

then later came to his house and physically attacked him. The district court was entitled to find that Chacon was a leader in the criminal activity of the Team.

2. The District Court Did Not Err when It Determined that Chacon Was Responsible for the Sale of at Least 2.8 Kilograms of Cocaine Base

The Guidelines establish a base offense level of 34 for an offense involving between 2.8 and 8.4 kilograms of cocaine base. U.S.S.G. § 2D1.1(c)(3). "When the amount of the drugs [actually] seized does not reflect the scale of the offense, the district court [instead] must approximate the drug quantity attributable to the defendant." *Reeves*, 742 F.3d at 506. In doing so, it "may rely on evidence demonstrating the average frequency and amount of a defendant's drug sales over a given period of time." *Id.* "This determination may be based on fair, accurate, and conservative estimates of the drug quantity attributable to a defendant, but it cannot be based on calculations of drug quantities that are merely speculative." *Id.* (alteration adopted) (quoting *Almedina*, 686 F.3d at 1316). Relevant here, when a district court sentences a member of a "jointly undertaken criminal activity," it may consider the conduct of "others that was . . . in furtherance of the jointly undertaken criminal activity" and "reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3 cmt. n.2. This analysis requires the district court to "first determine the scope of the criminal activity the particular defendant agreed to jointly undertake." *Id.*

42

The district court did not clearly err when it found that Chacon was responsible for at least 2.8 kilograms of cocaine base. As explained above, the evidence established the Chacon was a leader in a broad drug-trafficking conspiracy. And the district court was entitled to rely on the cooperators' testimony about Team activities to "approximate the drug quantity attributable to [Chacon]." *Reeves*, 742 F.3d at 506. Guzman testified that he sold one to two grams of cocaine base a day for 11 months in 2013. He also estimated that three to six other Team members sold one gram a day during his tenure with the Team. Zerquera testified that he sold two to three grams a day and estimated that the Team members he worked with sold three to 18 grams a day, with average daily sales between 16 and 18 grams. If the Team sold only 10 grams a day for 11 months—about 330 days—that would be 3.3 kilograms. So even a "conservative estimate[]" based on Guzman's numbers, *id.*, establishes that Chacon was responsible for more than 2.8 kilograms in the light of his substantial role in the conspiracy and the "jointly undertaken criminal activity," U.S.S.G. § 1B1.3 cmt. n.2.

### 3.    The District Court Did Not Commit Reversible Error when It Calculated Chacon's Criminal History

Chacon argues that the district court erred when it calculated his criminal-history score under section 4A1.1 of the Guidelines. He asserts that the district court erred when it counted a juvenile offense over his objection. And on appeal he argues for the first time that the district court erred when it counted five offenses

43

for which the court withheld adjudication of guilt. He contends that these supposed errors require remand for resentencing. We disagree.

### a.    The Juvenile Offense

The district court did not err when it counted Chacon's 2005 juvenile conviction for robbery. The Guidelines direct a district court to add one point for a "juvenile sentence imposed *within five years* of the defendant's commencement of the instant offense." U.S.S.G. § 4A1.2(d)(2)(B) (emphasis added). Chacon contends that his juvenile sentence fell outside the five-year window, but the district court was entitled to find otherwise, because Zerquera testified that Chacon was involved with the Team in 2008, fewer than five years after the 2005 sentence.

### b.    The Five Offenses for Which Adjudication Was Withheld

Under section 4A1.1(c), a district court must assign one criminal-history point, up to a total of four points, for each "prior sentence" of less than a term of imprisonment of 60 days. U.S.S.G. § 4A1.1(c). A "prior sentence" is "any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of *nolo contendere*." *Id*. § 4A1.2(a)(1). Ordinarily, "a sentence where adjudication of guilt is withheld" does not count. *United States v. Wright*, 862 F.3d 1265, 1280 (11th Cir. 2017); *see also United States v. Baptiste*, 876 F.3d 1057, 1062 (11th Cir. 2017). But if a defendant pleaded guilty or *nolo contendere* to an offense for which the state court withheld adjudication, that "prior offense is a diversionary

44

disposition that is properly counted as a prior sentence under [section] 4A1.1(c)." *Wright*, 862 F.3d at 1280 (citation and internal quotation marks omitted); *accord* U.S.S.G. § 4A1.2(f). The commentary to section 4A1.1(c) confirms that "[a] diversionary disposition is counted . . . where there is a finding or admission of guilt in a judicial proceeding." U.S.S.G § 4A1.1(c) cmt. n.3.

The presentence report assigned Chacon eight criminal-history points based on eight earlier offenses. It assigned one criminal-history point under section 4A1.1(c) for the 2005 juvenile robbery. It assigned two points under section 4A1.1(b) for a 2006 robbery for which adjudication was withheld in state court and Chacon was sentenced to two years of probation. It assigned one point under section 4A1.1(c) for a 2007 burglary and possession of a concealed weapon for which adjudication was withheld and Chacon was sentenced to two years of probation. It assigned two points under section 4A1.1(b) for a 2007 cocaine possession for which Chacon was adjudicated guilty and sentenced to 364 days of imprisonment. It assigned one point under section 4A1.1(c) for a 2010 marijuana possession for which adjudication was withheld and only fines and court costs were imposed. It assigned one point under section 4A1.1(c) for a 2011 marijuana possession for which adjudication was withheld and only fines and court costs were imposed. And it assigned one point under section 4A1.1(c) for a 2013 marijuana possession for which adjudication was withheld and only fines and court

45

costs were imposed. The presentence report assigned a total of nine points, but because section 4A1.1(c) allows only a maximum of four points for covered offenses, his final criminal-history score was eight. This score gave Chacon a criminal-history category of IV, which, coupled with his offense level of 40, produced a guideline range of 360 months to life imprisonment. *See* U.S.S.G. ch. 5, pt. A.

Chacon contends that the district court erroneously assigned criminal-history points for the five offenses for which adjudication was withheld, but he failed to make this argument to the district court, so we review only for plain error. *See United States v. Shelton*, 400 F.3d 1325, 1328 (11th Cir. 2005). Under this standard, the defendant must establish "that there is an error, it is plain, and it affects [his] substantial rights." *United States v. Suarez*, 893 F.3d 1330, 1335 (11th Cir. 2018).

No plain error occurred. Chacon had sufficient criminal-history points to produce a guideline range of 360 months to life imprisonment, so any error did not "affect[] [his] substantial rights." *Id.* The district court correctly assigned one criminal history point for the 2005 juvenile robbery. *See* U.S.S.G. § 4A1.2(d)(2)(B). It also correctly assigned two points for the 2007 cocaine possession for which the court sentenced Chacon to 364 days of imprisonment. *See id.* § 4A1.1(b). The 2006 robbery and 2007 burglary and firearm possession for

46

which adjudication was withheld and Chacon was sentenced to probation also add one point each because the record does not plainly establish that Chacon did not plead guilty or *nolo contendere* to these charges. *See Wright*, 862 F.3d at 1280. These five criminal-history points establish an offense level of III, which, when combined with the base offense level of 40, produces the same guideline range considered by the district court. *See* U.S.S.G. ch. 5, pt. A.

### 4.    Chacon's Sentence Is Substantively Reasonable

A district court must consider several factors before it imposes a sentence, including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). A sentence is substantively unreasonable if the district court "fails to afford consideration to relevant factors that were due significant weight," "gives significant weight to an improper or irrelevant factor," or "commits a clear error of judgment in considering the proper factors." *United States v. Rosales-Bruno*, 789 F.3d 1249, 1256 (11th Cir. 2015) (quoting *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc)). But "it is only the rare sentence that will be substantively unreasonable," *id.* (quoting *United States v. McQueen*, 727 F.3d 1144, 1156 (11th Cir. 2013)), and we must respect "the institutional advantage that district courts have in applying and weighing the [relevant] factors," *United States v. Pugh*, 515 F.3d 1179, 1190–91 (11th Cir. 2008). "The party challenging a

47

sentence has the burden of showing that the sentence is unreasonable in light of the entire record, the [statutory] factors, and the substantial deference afforded [to] sentencing courts." *Rosales-Bruno*, 789 F.3d at 1256. We "ordinarily expect a sentence within the [g]uidelines range to be reasonable," although we do not "automatically presume" that it is. *Hunt*, 526 F.3d at 746 (alteration adopted) (quoting *United States v. Talley*, 431 F.3d 784, 788 (11th Cir. 2005)).

Chacon asserts that his sentence of 420 months of imprisonment is substantively unreasonable, but we disagree. His sentence was within the guidelines range of 360 months to life imprisonment, *see* U.S.S.G. ch. 5, pt. A, so we "expect [it] to be reasonable," *Hunt*, 526 F.3d at 746 (quoting *Talley*, 431 F.3d at 788). Chacon complains that he received "more than triple the sentence [length]" of other members of the Team, *see* 18 U.S.C. § 3553(a)(6), but he overlooks that he is not "similarly situated to the defendants to whom he compares himself," *Duperval*, 777 F.3d at 1338. The members who received the shortest sentences cooperated with the government, and "[w]e have held that defendants who cooperate with the government and enter a written plea agreement are not similarly situated to a defendant who provides no assistance to the government and proceeds to trial." *United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009). And two other Team members who went to trial received lengthy sentences of 360 and 235 months. As explained above, Chacon's leadership role also supports a longer

48

sentence. The district court did not abuse its discretion in imposing a 420-month sentence.

### K.    *The Defendants' Other Arguments Are Meritless*

The defendants raise a number of other arguments about the sufficiency of the evidence, interpretation of the statutes of conviction, and alleged errors by counsel and the district court, but we have reviewed the record and determined that these contentions are meritless. These arguments contradict the record, are insufficiently developed, misunderstand the relevant statutes, or are not ripe for review.

### III. CONCLUSION

We **AFFIRM** the convictions and sentences of Dixon, Chacon, Portela, and Altamirano.

49